**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRITY BANCSHARES, INC. | ) | Case No. 08-80512 |
| | ) | |
| | ) | |
| Debtor. | ) | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** Suzanne Long, Robert F. Skeen, III, Douglas G. Ballard, II and Steven M. Skow, former directors and officers of Integrity Bancshares, Inc. (collectively "the Movants") have filed a **Motion for Approval of Defense Funding Under Directors' and Officers' Insurance Policy and for Relief from the Automatic Stay Under 11 U.S.C. § 362(d) to Effectuate the Same** (the "Motion") and related papers with the Court seeking an order granting relief from the automatic stay to allow the Movants to use proceeds from the Directors' and Officers' insurance policy to pay for costs and expenses associated with defending that certain securities lawsuit.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the Motion in*:* Courtroom 1401, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia at 10:00 a.m. on December 17, 2008.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the court to grant the relief sought in these pleadings or if you want the court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing. The address of the Clerk's Office is: Clerk, U. S. Bankruptcy Court, Suite 1340, 75 Spring Street, Atlanta Georgia 30303. You must also mail a copy of your response to the undersigned at the address stated below.

If a hearing on the motion for relief from the automatic stay cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

Dated: November 5, 2008

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
JOHN L. LATHAM
Georgia Bar No. 438675
john.latham@alston.com
JESSICA P. CORLEY
Georgia Bar No. 572733
jessica.corley@alston.com
KERRY VATZAKAS
Georgia Bar No. 141347
kerry.vatzakas@alston.com
WENDY R. REISS
Georgia Bar No. 600295
wendy.reiss@alston.com
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: 404-881-7000
Facsimile: 404-881-7777

Counsel for Suzanne Long

ARNALL GOLDEN GREGORY LLP

/s/ Aaron M. Danzig
AARON M. DANZIG
Georgia Bar 205151
aaron.danzig@agg.com
HENRY R. CHALMERS
Georgia Bar No. 118715
henry.chalmers@agg.com
Suite 2100
171 17th Street, NW
Atlanta, GA 30363-1031
Telephone: 404-873-8500
Facsimile: 404-873-8501

Counsel for Douglas G. Ballard, II

CHILIVIS COCHRAN LARKINS &
BEVER, LLP

/s/ Anthony L. Cochran
ANTHONY L. COCHRAN
Georgia Bar No. 172425

alc@cclblaw.com
3127 Maple Drive, N.E.
Atlanta, GA 30305
Telephone: 404-233-4171
Facsimile: 404-261-2842

Counsel for Robert F. Skeen, III

KILPATRICK STOCKTON

/s/ Stephen E. Hudson
STEPHEN E. HUDSON
Georgia Bar No. 374692
shudson@kilpatrickstockton.com
MONIFA WRIGHT
Georgia Bar No. 771788
mwright@kilpatrickstockton.com
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309-4530
Telephone: 404-815-6356
Facsimile: 404-541-3248

Counsel for Steven M. Skow

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRITY BANCSHARES, INC. | ) | Case No. 08-80512 |
| | ) | |
| | ) | |
| Debtor. | ) | |

**MOTION OF CERTAIN FORMER DIRECTORS AND OFFICERS OF
INTEGRITY BANCSHARES, INC. FOR APPROVAL OF DEFENSE FUNDING
UNDER DIRECTORS' AND OFFICERS' INSURANCE POLICY AND FOR
RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)
TO EFFECTUATE THE SAME AND MEMORANDUM OF LAW IN SUPPORT**

Suzanne Long, Robert F. Skeen, III, Douglas G. Ballard, II and Steven M. Skow,

former directors and officers of Integrity Bancshares, Inc.[1] ("Integrity") (collectively, the

"Movants"), through their undersigned counsel, hereby move for an Order (1) granting

relief from the automatic stay and (2) approving defense funding under the Financial

Institutions Blue Chip Policy # BCP 873 72 76 (the "Policy") issued to the Movants and

to Integrity by The Cincinnati Insurance Company ("Cincinnati Insurance").[2]

---

[1] The Debtor, Integrity, is an Atlanta-based bank holding company. Integrity Bank, its wholly-owned subsidiary, was a full service independent community bank. As discussed below, Integrity Bank is now in receivership.

[2] The filing of this Motion and related papers and any other paper previously, contemporaneously or subsequently filed in this bankruptcy case shall not constitute a waiver of the Movants' rights: (1) to have final orders in non-core matters entered only after de novo review by a District Judge; (2) to trial by jury in any proceeding so triable in this case or any case, controversy or proceeding related to this case; or (3) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal. The filing of this Motion and related papers and any other papers previously, contemporaneously or subsequently filed in this bankruptcy case shall further not constitute a waiver of any of the Movants' rights, remedies, claims, actions, defenses, setoffs, or recoupments, in law or in equity, against the Debtor and any other entities in this bankruptcy case or in any other action, all of which rights, remedies, claims, actions, defenses, setoffs, or recoupments are expressly reserved, and shall not constitute consent to the jurisdiction of the Bankruptcy Court.

## I.    Preliminary Statement

1.      As former directors and officers of Integrity Bank, the Movants were named as defendants in a securities fraud action brought by common stockholders of Integrity.  This action is described in paragraphs six through nine, below, and is referred to herein as the "Securities Lawsuit."  The Movants are "Insureds" under the Policy and are seeking coverage for defense costs and other covered losses in the Securities Lawsuit and any related litigation filed in the future.  See Policy (attached hereto as Exhibit "A").  The purpose of this Motion is to obtain relief from the automatic stay to authorize Cincinnati Insurance to pay defense costs and other covered losses of the Securities Lawsuit and any other related litigation from the Policy proceeds directly to the Movants' counsel, and to satisfy a non-contractual condition imposed by Cincinnati Insurance that this Court approve defense funding.[3]  Subject to a reservation of rights under the Policy, Cincinnati Insurance does not oppose this Motion.

2.      The Movants bring this Motion under Section 362 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the ground that "cause" exists to grant relief from the automatic stay under Section 362(d) of the Bankruptcy Code.

## II.    Facts

3.      Integrity is the holding company of Integrity Bank.  Integrity Bank was a full service independent community bank.  On August 29, 2008, Integrity Bank went into receivership, and its assets were taken over by the FDIC.  On October 13, 2008 (the

---

[3] The Movants bring this motion while reserving all objections to the exercise by this Court of jurisdiction over any claims which the Debtor or any party may assert against any of them.  This motion is brought before this Court only because 28 U.S.C. § 1334(e) and § 362 of Title 11 of the United States Code require that such motions be addressed to this Court, and solely to obtain the relief to which the Movants are entitled, as contemplated by 11 U.S.C. § 362.

"Petition Date"), Integrity filed its voluntary bankruptcy petition in this Court under Chapter 7 of the Bankruptcy Code.

4.     The named defendants in the Securities Lawsuit are all former directors and/or officers of Integrity.  All the Movants were named in the Securities Lawsuit, more fully described below, which was filed on September 12, 2008.  Pursuant to the Policy, Cincinnati Insurance is liable for the amounts of loss, including defense costs, up to the Policy limit of $10,000,000.00, as set forth in the Declarations to the Policy.  See Policy at p. 2.

5.     As of the Petition Date, Cincinnati Insurance notified the Movants that the Movants needed to obtain this Court's approval prior to any release of the Policy proceeds, for defense costs or otherwise.

**A.     The Securities Lawsuit**

6.     The Securities Lawsuit consists of a securities class action, styled *Allen, et al. v. Integrity Bancshares, Inc., et al.*, Civil Action No. 2008CV156807, filed in the Superior Court of Fulton County, State of Georgia.  On October 7, 2008, the defendants in the Securities Lawsuit removed the action to the District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1441(a), 28 U.S.C. § 1446, and SLUSA, 15 U.S.C. § 78bb.

7.     The complaint filed in the Securities Lawsuit alleges causes of action under O.C.G.A. §§ 10-5-12(a)(2) and 10-5-14, and for common law fraud and misrepresentation.

8.     On October 7, 2008, the defendants in the Securities Lawsuit filed a Motion to Dismiss because the plaintiffs' claims were preempted under federal law.

- 3 -

9.      On October 21, 2008, the plaintiffs in the Securities Lawsuit filed a Notice of Voluntary Dismissal Without Prejudice.   It is the understanding of counsel for Movants that the plaintiffs intend to re-file the Securities Lawsuit against Movants in the future asserting different claims.

**B.      The Movants' Insurance Coverage Claims Against Cincinnati Insurance**

10.     The Policy provides direct coverage to Integrity's directors and officers, including the Movants, under the Directors and Officers Liability and Company Coverage for Financial Institutions found at Part I of the Policy ("Part I").   In relevant part, Section 1A of Part I provides:

> We will pay, on behalf of the "directors and officers" all loss which they shall be legally obligated to pay, except for such "loss" which the "company" actually pays as indemnification, resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act."

Policy, p. 1 of 21.

11.     The Policy also provides for reimbursement of losses incurred by Integrity in indemnifying the officers and directors, including the Movants, under Part I.   In relevant part, Section 1B of Part I provides:

> We will pay on behalf of the "company" all "loss" which the "company" is required to pay as indemnification to the "directors and officers" resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act."

Policy, p. 1 of 21.

The Policy further provides "entity" coverage for claims against Integrity.

Section 1C of Part I provides:

> We will pay on behalf of the "company" all "loss" which the "company" is required to pay resulting from any "claim" first made during the "policy

period," or any "extended reporting period" included in or endorsed to the policy, against the "company" for a wrongful act."

Policy, p. 1 of 21.

The Securities Action Coverage Endorsement adds entity coverage for

Integrity for securities claims and provides:

We will pay on behalf of the "company" all "loss" which the "company" is required to pay resulting from any "securities action" first made during the "policy period" or any "extended reporting period" against the "company" for a "wrongful act."

Policy, Securities Action Coverage Endorsement.

12.     The Movants are "Insureds" under the definition in the Policy.  The Policy defines "Insureds" as the "company" and the "directors and officers."  Policy, p. 3 of 21.

13.     The Securities Lawsuit is a "Claim" under the definition in the Policy. The Policy defines "Claim," in relevant part, as any (1) proceeding initiated against any of the insureds before any governmental body which is legally authorized to render an enforceable judgment or (2) any "securities action."  Policy, Securities Action Coverage Endorsement.

14.     The allegations made in the Securities Lawsuit fall within the Policy's definition of "Wrongful Acts" as any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed by any of the "directors and officers" in the discharge of their duties.   Policy, Securities Action Coverage Endorsement.

15.     Sections 1A and 1B of Part I pay for all "Loss" defined as including the total amount of monetary damages which the Insureds become legally obligated to pay on

- 5 -

account of any "claim" for a "wrongful act" including damages, judgments, settlements, and "defense costs." Policy, Securities Action Coverage Endorsement.

16.    Under the foregoing Policy definitions, the Movants seek coverage for their Loss, including defense costs, arising out of the claims made against them in the Securities Lawsuit and any related future litigation.

17.    Upon the filing of Integrity's bankruptcy petition, Cincinnati Insurance conditioned payment of covered defense costs on a requirement not stated in the Policy -- i.e., that the Movants obtain the approval of this Court.   Authorities establish that, although Integrity and its creditors may have a legal or equitable right to the Policy proceeds, notwithstanding the bankruptcy stay, a balancing of the competing interests shows that "cause" exists under Section 362(d) of the Bankruptcy Code to lift the automatic stay to authorize Cincinnati Insurance to pay Movants' counsel for defense costs as provided for under the Policy.

### III.    Argument

**A.    The Debtor's Interest in the Policy Proceeds, as Distinct from the Policy Itself, is Determined According to the Language of the Policy.**

18.    Under the Bankruptcy Code, a bankruptcy estate includes "all legal and equitable interests of the debtor in property as of the commencement of the bankruptcy case." 11 U.S.C. § 541(a)(1).  Although the debtor's interest in insurance proceeds, and perhaps the insurance policy itself, becomes property of the debtor's estate, courts have recognized that the interests of a non-debtor co-insured party in the same proceeds do not become property of the debtor's estate.  In other words, courts recognize that the non-debtor co-insured retains its separate and distinct interest in proceeds of an insurance policy, notwithstanding the intervention of the debtor's bankruptcy.  See, e.g., Liberty

Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.), 207 B.R. 899 (B.A.P. 9th Cir. 1997); Ford Motor Credit Co. v. Stevens (In re Stevens), 130 F.3d 1027, 1030 (11th Cir. 1997); Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993) ("Insurance policies are property of the estate because, regardless of who the insured is, the debtor retains certain contract rights under the policy itself."); Adelphia Commc'ns Corp. v. Associated Elec. & Gas Ins. Servs., Ltd. (In re Adelphia Commc'ns Corp.), 285 B.R. 580, 590 (Bankr. S.D.N.Y. 2002) ("Adelphia I"), vacated and remanded on other grounds, 298 B.R. 49 (S.D.N.Y. 2003).[4]  "That principle has been applied in the specific context of [Director & Officer ("D & O")] insurance policies, and numerous courts have held that those policies (as contrasted to their proceeds. . .) are property of the estate under section 541." Adelphia Comm'ns Corp. v. Associated Elec. & Gas Ins. Servs., Ltd. (In re Adelphia Commc'ns Corp.), 302 B.R. 439, 452 (Bankr. S.D.N.Y. 2003) ("Adelphia II"); In re Stevens, 130 F.3d at 1029 ("The fact that the insurance policy is property of the bankruptcy estate, however, does not necessarily mean that the proceeds from that policy are also property of the estate."); see also In re Sfuzzi, Inc., 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996) ("[I]nsurance policies are property of the estate ... but the question of whether the proceeds are property of the estate must be analyzed in light of the facts of each case.").  Several courts have held, moreover, that proceeds of a director and officer liability policy are not property of the debtor's estate.  See In re CHS Elecs., 261 B.R. 538 (Bankr. S.D. Fla. 2001) (director and officer liability policy proceeds not property of

---

[4] Adelphia I was reversed and remanded to allow further factfinding on whether litigation between certain allegedly covered parties and the insurers should be stayed.  In re Adelphia Comm'ns Corp., 2003 U.S. Dist. LEXIS 14505, at *13-*17 (S.D.N.Y. Aug. 20, 2003).  As to the other matters set forth in this Motion, Adelphia I remains instructive.

the debtor's estate); <u>Ochs v. Lipson (In re First Cent. Fin. Corp.)</u>, 238 B.R. 9, 15-18 (Bankr. E.D.N.Y. 1999) (same); <u>In re Imperial Corp. of Am.</u>, 144 B.R. 115, 118-119 (Bankr. S.D. Cal. 1992) (same); <u>Imperial Corp. of Am. V. Milberg, Weiss, Bershad, Specthrie & Lerach (In re Daisy Sys. Sec. Litig.)</u>, 132 B.R. 752, 755 (Bankr. N.D. Cal. 1991) (same).

19.    In <u>Spaulding</u>, the Ninth Circuit Bankruptcy Appellate Panel recognized the separate property rights of non-debtor co-insureds.  There, Liberty Mutual Insurance Company ("Liberty") issued a number of general liability policies that provided coverage to Spaulding and Spaulding's two corporate shareholders.  <u>Spaulding</u>, 207 B.R. at 901.  Spaulding filed for Chapter 11 bankruptcy, and various claims were filed against the estate seeking compensation for pollution remediation costs associated with the cleanup of hazardous waste on facilities operated by Spaulding.  <u>Id.</u>  The non-debtor co-insured shareholders did not file bankruptcy.  <u>Id.</u>  Liberty filed a declaratory judgment action against the non-debtor co-insured shareholders to establish Liberty's liability (if any) under the insurance policies.  <u>Id.</u> at 901-902.  In response to Liberty's suit, the Unsecured Creditors Committee in Spaulding's bankruptcy filed an adversary complaint against Liberty, seeking a declaration that Liberty's declaratory judgment action violated the automatic stay because Spaulding had an interest in the insurance policies.  <u>Id.</u> at 902.  The <u>Spaulding</u> court disagreed, holding that Liberty did not violate the automatic stay by filing the declaratory judgment action.  The Ninth Circuit B.A.P. refused to characterize the non-debtor co-insured shareholders' interests in the Liberty policies as property of the bankruptcy estate, stating:

> Although Spaulding claims an interest in many of the policies, [the non-debtor co-insured shareholders] also claim coverage under those policies.

That two separate property interests might exist in a single policy was a
point recognized by the Fifth Circuit . . . .

. . . . Here, [the non-debtor shareholders] are both coinsured with the
debtor.  Additionally, their property rights are not merely derivative of
Spaulding's rights; [the non-debtor co-insured shareholders] assert their
own independent rights to coverage. . . .  True, Spaulding asserts an
interest in the policies, but, as the Seventh Circuit has stated, a "debtor's
interest in a portion of property does not subject the entire property to §
541.  Nor does a debtor's claim to property mean that the entire property is
part of the bankruptcy estate."

Id. at 906-907 (citing In re Carousel Int'l Corp., 89 F.3d 359, 362 (7th Cir. 1996)).

20.    The recognition of separate and distinct property rights of non-debtor co-
insureds comports with the doctrine that the "owner of an insurance policy cannot obtain
greater rights to the proceeds of that policy ... by merely filing a bankruptcy petition."  In
re Denario, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001); see also Butner v. United States,
440 U.S. 48, 55 (1979) ("Unless some federal interest requires a different result, there is
no reason why [property] interests should be analyzed differently simply because an
interested party is involved in a bankruptcy proceeding.").

21.    Thus, because the Bankruptcy Code does not increase the debtor's
interests in a given policy, proceeds under an insurance policy (as opposed to the policy
itself) are only property of the estate if the debtor is entitled to proceeds under
circumstances set forth in the policy.  See, e.g., Adelphia I, 285 B.R. at 591 ("[W]here the
debtor has had a material interest in the proceeds of D & O policy for its own economic
exposure – e.g., by way of reimbursement for any indemnification payments it might
make, or for 'entity coverage,' satisfying issuer obligations on account of securities fraud
liability – courts have recognized the interest of the debtor in the policy proceeds as well
as the policy itself, with the result that the proceeds too are property of the estate.")  Id. at

591.  Like the Policy at issue here, the D&O policy the Bankruptcy Court considered in

Adelphia I, provided "entity coverage," protecting the estate on account of its exposure as

issuer to securities law claims and also provided reimbursement to the estate to the extent

that the estate advanced funds by reason of indemnification obligations.  Id. at 592.

Those showings, the Bankruptcy Court held, are exactly the kinds of showings that have

been held to be sufficient to make policy proceeds property of the estate, and thus require

relief from the automatic stay to access policy proceeds.  See also In re Allied Digital

Tech. Corp., 306 B.R. 505, 511 (Bankr. D. Del. 2004) ("When a liability insurance policy

provides direct coverage to the debtor as well as the directors and officers, the general

rule is that since the insurance proceeds may be payable to the debtor they are property of

the debtor's estate.").

> **B.    Cause Exists to Lift the Automatic Stay to Allow the Movants to Obtain Defense Costs under the Policy, Despite the Debtor's Interest in Policy Proceeds.**

22.    Section 362(d) of the Bankruptcy Code provides for relief from the

automatic stay as follows:

> (1) for cause, including the lack of adequate protection of an interest in
> property of such party in interest; or (2) with respect to a stay of an act
> against property . . . if -- (A) the debtor does not have an equity in such
> property; and (B) such property is not necessary to an effective
> reorganization.

Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.), 54 F.3d 722, 724

(11th Cir. 1995).  The language of Section 362(d) of the Bankruptcy Code is mandatory.

The Court shall grant relief from the automatic stay if the grounds in either subsection (1)

or (2) have been met.  Id.

23.    The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge.  See B.F. Goodrich Employees Fed. Credit Union v. Patterson (In re Patterson), 967 F.2d 505, 509 (11th Cir. 1992); Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.), 871 F.2d 1023, 1026 (11th Cir. 1989). Unlike a request for relief from the automatic stay to proceed with plenary litigation, leave to request payment on account of a corporate liability insurance policy requires this Court to consider "the extent to which [it] should interfere with the expectations of insureds under D&O policies to receive their direct entitlements under D&O policies to defense costs and payments on account of liability, when a bankruptcy estate, by reason of indemnity coverage or entity coverage, has a competing claim to it."  Adelphia I, 285 B.R. at 596.  "In essence and at its core, a D&O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection."  In re First Cent. Fin. Corp., 238 B.R. at 16.

24.    As the Spaulding court held, the Movants clearly have a distinct and separate interest in the proceeds of the Policy.  Outside the bankruptcy context, the Movants would have the right to draw on the Policy proceeds, regardless of Integrity's interest in the Policy and regardless of whether other claims might be made against the proceeds in the future.  See, e.g., Scharnitzi v. Bienenfeld, 534 A.2d 825, 827 (Pa. Super. Ct. 1987) ("[T]he majority rule holds that where several claims arise from a single insured event but where judgments for those claims were or are to be obtained against an insured in different actions, the insurance company may distribute the proceeds on a first-come-first-served basis according to priority of judgment, even if the insurer's maximum liability under the policy is inadequate to compensate all claimants.").

25.    In sum, allowing the automatic stay to prevent the Movants from drawing on the proceeds of the Policy would improperly grant the Debtor greater rights in the Policy and the proceeds than the Debtor would have outside the bankruptcy context.  The courts that have considered the issue before this Court have granted relief from the automatic stay (to the extent the stay applies at all) and have permitted non-debtor co-insureds to draw on insurance proceeds to pay for defense costs.  See, e.g., In re CyberMedica, Inc., 280 B.R. 12 (Bankr. D. Mass. 2002); Adelphia I, 285 B.R. at 580; In re Enron Corp., No. 01-16034 (AJG), 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002).

26.    In CyberMedica, the debtor maintained a D&O insurance policy that provided coverage to CyberMedica's directors and officers (individual coverage), as well as coverage directly to CyberMedica itself (entity coverage).  CyberMedica, 280 B.R. at 14.  CyberMedica's Chapter 7 Trustee filed a complaint against two former directors of CyberMedica based on alleged fraudulent transfers and other claims.  The former directors sought payment of defense costs from the D&O policy.  Id.  The Trustee responded that the former directors did not have a right to payment of defense costs because such payment would deplete the funds available to the debtor under the policy.  Id. at 14-15.  The court rejected the Trustee's position:

> This Court further finds that there is cause to lift the automatic stay because [the former directors] may suffer substantial and irreparable harm if prevented from exercising their rights to defense payments.  [The former directors] are in need now of their contractual right to  payment of defense costs and may be harmed if disbursements are not  presently made to fund their defense of the Trustee's Complaint.

Id. at 18.  The CyberMedica court reasoned further that the debtor would not be harmed by payment of defense costs because the debtor ultimately would be obligated to

indemnify the directors against those costs anyway.  Id. at 18.  As the court noted, "[I]n its essence and at its core, a D&O policy remains a safeguard of officer and director interest and not a vehicle for corporate protection."  Id. at 17; see also Executive Risk Indem., Inc. v. Boston Reg'l Med Ctr., Inc. (In re Boston Reg'l Med. Ctr., Inc.), 285 B.R. 87, 96 (Bankr. D. Mass. 2002) ("If the costs of defense are not disbursed in time to provide the defense, a significant part of their value and of their function will have been lost."); see also In re Allied Digital Tech. Corp., 306 B.R. 505, 514 (Bankr. D. Del. 2004) (holding that although D&O policy proceeds were technically property of bankruptcy estate, cause existed under Section 362(d) of the Bankruptcy Code to lift stay to allow payment of co-insured directors' defense costs because, "[w]ithout funding, the [directors] will be prevented from conducting a meaningful defense to the Trustee's claims and may suffer substantial and irreparable harm.  The directors and officers bargained for this coverage."); In re First Cent. Fin. Corp., 238 B.R. 9, 15 (Bankr. E.D.N.Y. 1999) (D&O policies are obtained for the protection of individual directors and officers).

27.    In Enron, in response to motions filed by both the insurer and non-debtor co-insured directors and officers of Enron, the court simply lifted the automatic stay (to the extent it applied) to permit the parties to the D&O policies at issue to exercise whatever contractual rights they might have under the policies.  Enron, 2002 WL 1008240, at *1.  In other words, the co-insureds' rights to the proceeds of the policies were to be determined outside the context of the bankruptcy.

28.    As demonstrated by the foregoing cases, although courts rely on slightly varying theories, they ultimately all reach the same essential conclusion: non-debtor co-

insured directors and officers cannot be prohibited from exercising their contractual rights to draw on D&O proceeds to cover defense costs and thereby protect their legal interests.  Under the Spaulding line of cases, the co-insured's distinct contractual interest in the policy proceeds does not even become property of the estate.  Other courts find that, even if the stay applies, there is cause for relief under Section 362(d) of the Bankruptcy Code because preventing individual insureds from defending their interests would impose a substantial and irreparable hardship.  See In re First Cent. Fin. Corp., 238 B.R. at 15.

29.    In this case, the Movants reasonably and properly have incurred defense costs to defend their personal interests.  As described above, it has been, and will continue to be, necessary for the Movants to incur defense costs and other losses to safeguard their interests.  That is precisely what the Policy covers.  Preventing the Movants from exercising their contractual right to draw on the insurance proceeds will result in the Movants being without legal representation, a patently unjust result.  Imposing a stay on the Policy proceeds would inflict dire harm on the Movants, who would be left to face the Securities Lawsuit "naked" of defense funding.  Integrity and its creditors, on the other hand, would suffer no harm if the stay were lifted to permit defense funding.  In sum, the equities demand that relief be granted to permit funding of defense costs and other covered losses in the Securities Lawsuit and other related claims that may arise in the future.

### IV.    <u>Notice</u>

30.    Notice of this Motion has been provided to (i) the Debtor, (ii) counsel to the Debtor; and (iii) The United States Trustee.  The Movants respectfully submit that such notice is appropriate, and that no further notice is necessary.

### V.    <u>Conclusion</u>

For the foregoing reasons, Movants respectfully request relief from the automatic stay under Section 362(d) of the Bankruptcy Code and entry of an Order approving funding of defense costs and other covered losses under the Policy by Cincinnati Insurance.

Dated: November 5, 2008.

Respectfully Submitted,

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
JOHN L. LATHAM
Georgia Bar No. 438675
john.latham@alston.com
JESSICA P. CORLEY
Georgia Bar No. 572733
jessica.corley@alston.com
KERRY VATZAKAS
Georgia Bar No. 141347
kerry.vatzakas@alston.com
WENDY R. REISS
Georgia Bar No. 600295
wendy.reiss@alston.com
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: 404-881-7000
Facsimile: 404-881-7777

Counsel for Suzanne Long

ARNALL GOLDEN GREGORY LLP

/s/ Aaron M. Danzig
AARON M. DANZIG
Georgia Bar 205151
aaron.danzig@agg.com
HENRY R. CHALMERS
Georgia Bar No. 118715
henry.chalmers@agg.com
Suite 2100
171 17th Street, NW
Atlanta, GA 30363-1031
Telephone: 404-873-8500
Facsimile: 404-873-8501

Counsel for Douglas G. Ballard, II

CHILIVIS COCHRAN LARKINS &
BEVER, LLP

/s/ Anthony L. Cochran
ANTHONY L. COCHRAN
Georgia Bar No. 172425
alc@cclblaw.com
3127 Maple Drive, N.E.
Atlanta, GA 30305
Telephone: 404-233-4171
Facsimile: 404-261-2842

Counsel for Robert F. Skeen, III

KILPATRICK STOCKTON

/s/ Stephen E. Hudson
STEPHEN E. HUDSON
Georgia Bar No. 374692
shudson@kilpatrickstockton.com
MONIFA WRIGHT
Georgia Bar No. 771788
mwright@kilpatrickstockton.com
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309-4530
Telephone: 404-815-6356
Facsimile: 404-541-3248

Counsel for Steven M. Skow

-16-

# EXHIBIT "A"

Financial Institutions Blue Chip Policy # BCP 873 72 76

INTEG-2          POLZ   PE+O  8.2806/09 CIC

# THE
# CINCINNATI INSURANCE COMPANY

P.O. BOX 145496
CINCINNATI, OHIO 45250-5496
(513) 870-2000

Policy Number: __BCP 873 72 76__ ✓          Previous Policy Number: _____

# FINANCIAL INSTITUTIONS BLUE CHIP POLICY
# DECLARATIONS

**NOTICE:**  **THIS INSURANCE COVERAGE CONTAINS CLAIMS MADE COVERAGE. THIS INSURANCE IS LIMITED TO "WRONGFUL ACTS" FOR WHICH "CLAIMS" ARE FIRST MADE AGAINST THE "POLICY INSUREDS" DURING THE "POLICY PERIOD". PLEASE READ AND REVIEW THIS INSURANCE CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR AGENT.**

**THE LIMITS OF INSURANCE AVAILABLE TO PAY DAMAGES, JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS "DEFENSE COSTS".**

**COVERAGE UNDER ANY PARTICULAR COVERAGE PART IS NOT IN FORCE UNLESS THE CORRESPONDING SECTION OF THE DECLARATIONS HAS BEEN COMPLETED.**

## COVERAGE PARTS

Part I     Directors and Officers Liability and Company Coverage

Part II    Employment Practices Liability Coverage

Part III   Trustee and Fiduciary Liability and Employee Benefits Administration Coverage

Part IV    Trust Department Errors and Omissions Coverage

Part V     General Provisions Applicable to All Coverage Parts

## General Declarations

Item 1.  Named Insured:
**Integrity Bancshares, Inc.**          ✓

Principal Address:
**11140 State Bridge Rd.**
**Alpharetta, GA  30022**

Item 2.  Total Annual Premium for the Policy (all Coverage Parts combined): $ **112,705.**
Premium is payable ☐ Annually ☐ Semi-Annually ☐ Quarterly ☒ Prepaid (for
Policy Period) as follows:
Advance Premium   $  **112,705.**       (includes installment charge of $ **N/A**_____ )
Each Subsequent Installment  $ **N/A**_____ (includes installment charge of $ **N/A**_____ )

Item 3.  Forms and endorsements applicable to this Policy at policy inception:
**REFER TO IA450F**

09-13-2006 MT2

AGENT'S COPY

BC 501 08 03                                                        Page 1 of 4

**Part I Declarations - <u>Directors and Officers Liability and Company Coverage</u>**

Item 1.  Insured Entity:
  **Integrity Bancshares, Inc.**

  Principal Address:
  **11140 State Bridge Rd.**
  **Alpharetta, GA  30022**

Item 2.  Coverage under the following Insuring Agreements has been purchased:
  **I.A, I.B., I.C.**

If Insuring Agreement I.C. is not listed above, coverage under Insuring Agreement I.C. of Coverage Part I
does not apply and any other references thereto in this policy shall be deemed to be deleted therefrom.

Item 3.  Policy Period:  from 12:01 a.m.  **08-28-2006**  to 12:01 a.m.  **08-28-2009**
  local time at the address set forth in Item 1. of the General Declarations

Item 4.  Limit of Insurance:          $ **10,000,000.**      in the aggregate

Item 5.  Deductibles:
  Insuring Agreement I.A.:    $ **-0-**          each of the "directors and officers"
                                                 each "claim" subject to a
                                                 maximum aggregate payment of

                              $ **-0-**          each "claim" for all "directors and officers"

  Insuring Agreement I.B.:    $ **75,000.**      each "claim"
  Insuring Agreement I.C.:    $ **75,000.**      each "claim"

Item 6.  Retroactive Date:            **N/A**

Item 7.  Prior and / or Pending Date:  **08-28-2006**

Item 8.  Total Annual Premium for this
  Coverage Part:             $ **79,622.**

**Part II Declarations - <u>Employment Practices Liability Coverage</u>**

Item 1.  Insured Entity:
  **Integrity Bancshares, Inc.**

  Principal Address:
  **11140 State Bridge Rd.**
  **Alpharetta, GA  30022**

Item 2.  Policy Period:  from 12:01 a.m.  **08-28-2006**  to 12:01 a.m.  **08-28-2009**
  local time at the address set forth in Item 1. of the General Declarations

Item 3.  Limit of Insurance:          $ **10,000,000.**      in the aggregate

Item 4.  Deductible:                  $ **50,000.**          each "claim"

BC 501 08 03                                                    Page 2 of 4

06/25/2007 16:22 FAX 7705320608          SIDNEY  O SMITH                          ☐004

Item 5.  Retroactive Date:                    N/A

Item 6.  Prior and / or Pending Date:         08-28-2006

Item 7.  Total Annual Premium for this
         Coverage Part:                    $  26,965.

## Part III Declarations - Trustee and Fiduciary Liability and Employee Benefits Administration Coverage

Item 1.  Insured Entity:
         **Integrity Bancshares, Inc. & Integrity Bank, ET AL**

         Principal Address:
         **11160 State Bridge Rd.**
         **Alpharetta, GA  30022**

Item 2.  Policy Period:    from 12:01 a.m.   **08-28-2006**    to 12:01 a.m.   **08-28-2009** ✓
                           local time at the address set forth in Item 1. of the General Declarations

Item 3.  Limit of Insurance:              $  **5,000,000.** ✓  in the aggregate

Item 4.  Deductible:                      $  **50,000.** ✓  each "claim"

Item 5.  Retroactive Date:                    N/A

Item 6.  Prior and / or Pending Date:         08-28-2006

Item 7.  Total Annual Premium for this
         Coverage Part:                    $  6,118.

## Part IV Declarations - Trust Department Errors and Omissions Coverage

Item 1.  Insured Entity:
         **COVERAGE NOT PURCHASED AS OF POLICY INCEPTION DATE.** ☞

         Principal Address:

Item 2.  Policy Period:    from 12:01 a.m.   _____   to 12:01 a.m.   _____
                           local time at the address set forth in Item 1. of the General Declarations

Item 3.  Limit of Insurance:              $  _____  in the aggregate

Item 4.  Deductible:                      $  _____  each "claim"

Item 5.  Retroactive Date:                    _____

Item 6.  Prior and / or Pending Date:         _____

BC 501 08 03                                                              Page 3 of 4

Item 7.   Total Annual Premium for this
          Coverage Part;              $ _____

These Declarations together with the completed "proposal", all applicable Coverage Parts, the General Provi-
sions and any accompanying endorsements shall constitute the contract between the "policy insureds" and
The Cincinnati Insurance Company.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties
and what is and is not covered.

Countersigned _____ By _____
                     (Date)                          (Authorized Representative)

In witness whereof, we have caused this policy to be signed by our President and Secretary. This policy shall
not be valid unless countersigned by our duly authorized representative. This provision does not apply in Ari-
zona, Virginia and Wisconsin.

Kenneth W. Stecher

John Schiff

          Secretary                              President

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY DECLARATIONS**

### FORMS LIST

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| IA450F | 11/87 | BC101 | 03/99 | IP446 | 08/01 | BC325 | 03/01 |
| BC327 | 02/03 | BC417 | 03/99 | BC441GA | 08/03 | BC456 | 01/06 |
| IA4236GA | 01/06 | F3132A | 06/83 | F3132B | 06/83 | F3132C | 06/83 |
| F3132D | 06/83 | F3132E | 06/83 | F3132F | 06/83 | | |

IA 450 11 87 F

# FINANCIAL INSTITUTIONS BLUE CHIP POLICY

### PART I

### DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE
### FOR FINANCIAL INSTITUTIONS

In consideration of the payment of the premium, in reliance on all statements in the "proposal" and all other information provided to us and subject to all the provisions of this policy, including the General Declarations, the Part I Declarations and Coverage Part V General Provisions, we and the "insureds" agree as set forth below.

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the "directors and officers" all "loss" which they shall be legally obligated to pay, except for such "loss" which the "company" actually pays as indemnification, resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act".

**B.** We will pay on behalf of the "company" all "loss" which the "company" is required to pay as indemnification to the "directors and officers" resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act".

**C.** We will pay on behalf of the "company" all "loss" which the "company" is required to pay resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, against the "company" for a "wrongful act".

We will have the right and duty to defend the "insureds" against any such "claim".

## SECTION II - EXCLUSIONS

We are not liable to pay, indemnify or defend any "claim":

**A.** Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 as amended or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law in connection with any pension or welfare plan established for the benefit of employees of the "company"; or

**B.** Brought or maintained by, on behalf of or at the behest of any of the "insureds", or any entity under common control with the "company"; provided, however, this exclusion does not apply to:

    **1.** Any "claim" brought or maintained as a derivative action on behalf of the "company" by one or more persons who are not "directors and officers" and who bring and maintain the "claim" without the solicitation, assistance or participation of any of the "insureds" or any entity under common control with the "company"; or

    **2.** Any "claim" brought or maintained by any of the "insureds" or any entity under common control with the "company" for contribution or indemnity, if such "claim" for contribution or indemnity directly results from another "claim" covered by this Coverage Part; or

**C.** Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any "wrongful act" in the discharge of the duties of the "directors and officers" as a director, officer, trustee, employee or member of any entity other than the "company", even if directed or requested to serve such other entity by the "company"; provided, however, this exclusion shall not apply to the extent:

    **1.** Such "claim" is based on the service of any of the "directors and officers" as a director, officer, governor, trustee or in an executive position equivalent to the foregoing in any "outside organization" if the service is performed at the direction of the "company" or with the consent and knowledge of the "company"; and

    **2.** The "loss" resulting from such "claim" is not indemnified by the "outside organization" or any of its insurers; or

**D.** Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged violation of:

    **1.** The Securities Act of 1933 as amended or the Securities Exchange Act of 1934 as amended; or

BC 101 03 99

2.  Any state Blue Sky or other state securities law applicable to publicly held shares; or

3.  Any rule, regulation or order issued pursuant to any of the statutes set forth in Exclusions II.D.1. or II.D.2. of this Coverage Part, or any federal or state common law concerning such acts, laws, rules, regulations or orders; or

E.  For legal liability arising by virtue of the "company" purchasing or participating in any loan or transaction in the nature of a loan not originating with the "company", or for that portion of any "claim" representing the principal amount plus interest of any loan or transaction in the nature of a loan originating with the "company"; or

F.  Brought or maintained by or at the behest of any federal or state government or government entity except if the government or government entity is acting solely in the capacity of a customer or client or on behalf of a customer or client of the "company"; or

G.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving depreciation (or failure to appreciate) in value of any investments, including but not limited to securities, commodities, currencies, leased products or services, options, derivatives and futures transactions, or as a result of any actual or alleged representation, guarantee or warranty provided by or on behalf of any of the "insureds" as to the performance of any such investments; or

H.  For the reimbursement of fees, commissions, costs or other charges paid or payable to any of the "insureds", or based upon allegations against any of the "insureds" of excessive fees, commissions, costs or other charges; or

I.  For legal liability arising from or contributed to by any failure to provide insurance of any kind, whether such failure concerns the amount, existence or adequacy of such insurance or otherwise; provided, however, that this exclusion shall not apply to any "loss" due solely to negligence on the part of any of the "insureds" in failing to effect or maintain a specific insurance in accordance with the specific prior instructions of a customer or client of the "company"; or

J.  Based upon, arising out of directly or indirectly resulting from or in consequence of, or in any way involving any actual or attempted merger, purchase or acquisition of another entity by the "company" or any purchase or sale transactions in the shares of the "company" except to the extent that any of the "insureds" is acting upon the specific prior instructions of a customer or client of the "company"; or

K.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.  Underwriting, syndicating or promoting any security, or any investment banking activity; or

2.  Rendering advice or recommendations regarding any actual, attempted or threatened: merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of substantially all of the assets or stock of an entity; or

3.  The rendering of a fairness opinion, or any proprietary trading, or any acquisition or sale of securities by the "company" for its own account; or

L.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the bankruptcy, insolvency of, or suspension of payment by any bank or banking firm, any broker or dealer in securities or commodities, any insurance company, or any other financial institution.

The "wrongful act" of any one of the "insureds" shall not be imputed to any other of the "insureds" for the purpose of determining the applicability of the above Exclusions.

## SECTION III - LIMIT OF INSURANCE AND DEDUCTIBLES

A.  We will pay 100% of "loss" in excess of the applicable Deductible amount set forth in the Part I Declarations up to the Limit of Insurance set forth in the Part I Declarations.

B.  In the event a single "claim" is covered under more than one Insuring Agreement, the Deductibles set forth in the Part I Declarations shall be applied separately to the part of the "loss" resulting from such "claim" covered by each Insuring Agreement and the sum of the Deductibles so applied shall constitute the Deductible for each single "claim"; provided, however, that the total Deductible as finally determined shall in no event exceed the largest of the applicable Deductibles. Notwithstanding the aforementioned, the deductible applicable to Insuring Agreement I.B. shall apply to "loss" payable under any of the Insuring Agreements for which indemnification by the "company" is legally permissible whether or not actual indemnification is granted. The Deductible shall be paid by the "insureds". Any "loss" paid by us within the

Deductible shall be reimbursed by the "insureds" within 30 days of our written request for such reimbursement.

C. "Defense costs" shall be part of and not in addition to the Limit of Insurance set forth in the Part I Declarations. "Defense costs" we pay shall reduce the Limit of Insurance. "Defense costs" paid by the "insureds" shall be applied against the Deductible.

D. Our maximum aggregate liability for all "loss" resulting from all "claims" under this Coverage Part shall be the Limit of Insurance set forth in the Part I Declarations.

## SECTION IV - DEFINITIONS

Where set forth in quotes in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

A. "Claim" means any proceeding initiated against any of the "insureds" before any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief, including any appeal from such proceeding.

B. "Company" means the "insured entity" and any "subsidiary".

C. "Directors and officers" means:

1. All persons who were, now are, or shall be directors or officers of the "company"; and

2. The lawful spouse of a director or officer, but only to the extent such person is a party to any "claim" solely in such person's capacity as a spouse of a director or officer of the "company" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the director or officer and the spouse, or property transferred from the director or officer to the spouse,

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

D. "Insureds" means the "company" and the "directors and officers".

E. "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

"Loss" shall not include:

1. Taxes, criminal or civil fines, or penalties imposed by law; or

2. Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied; or

3. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

F. "Outside organization" means any non-profit corporation, community chest, fund or foundation other than the "company", which is described in Section 501(c)(3) of the Internal Revenue Code of 1986 as amended, and is exempt from federal income taxation.

G. "Professional services" means the activities allowed under the law and regulations governing financial institutions which are performed for or on behalf of any client or customer of the "company".

H. "Subsidiary" means any entity which is more than 50% owned by the "insured entity" of Coverage Part I directly or indirectly at the Coverage Part inception date.

I. "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part I Declarations and prior to the end of the "policy period" by:

1. Any of the "directors and officers" in the discharge of their duties solely in their capacity as a director or officer of the "company"; or

2. Any officers of the "company" who are "directors and officers" in the discharge of their duties solely in their capacity as a director, officer, governor, trustee or in an executive position equivalent to the foregoing in any "outside organization" if the service is performed at the direction of the "company" or with the consent and knowledge of the "company"; or

3. The "company" in the performance of "professional services".

BIC 101 03 99

## PART II

### EMPLOYMENT PRACTICES LIABILITY COVERAGE
### FOR FINANCIAL INSTITUTIONS

In consideration of the payment of the premium, in reliance on all statements in the "proposal" and all other information provided to us and subject to all the provisions of this policy, including the General Declarations, the Part II Declarations and Coverage Part V General Provisions, we and the "insureds" agree as set forth below.

### SECTION I - INSURING AGREEMENT

We will pay on behalf of the "insureds" all "loss" which they shall be legally obligated to pay resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act".  We will have the right and duty to defend the "insureds" against any such "claim".

### SECTION II - EXCLUSIONS

This insurance does not apply to:

A.   "Loss" incurred by the "insured" in making physical changes, modifications, alterations, or improvements as part of an accommodation pursuant to the Americans With Disabilities Act or similar provisions of any federal, state or local statutory or common law; provided, however, this exclusion does not apply to "defense costs"; or

B.   Any "claim" based upon, arising out of, or attributable to any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by the:

   1.   Employee Retirement Income Security Act of 1974; or

   2.   Fair Labor Standards Act (except the Equal Pay Act); or

   3.   National Labor Relations Act (including the Labor Management Relations Act of 1947); or

   4.   Worker Adjustment and Retraining Notification Act; or

   5.   Consolidated Omnibus Budget Reconciliation Act of 1985; or

   6.   Occupational Safety and Health Act; or

   any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory or common law.  However, this exclusion shall not apply to a "claim" for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Fair Labor Standards Act or the Occupational Safety and Health Act by an "insured"; or

C.   Any "claim" based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged obligation of any "insured" under any workers' compensation, unemployment insurance, social security, disability benefits or similar law, or derivative actions arising out of any of these.  However, this exclusion shall not apply to any "claim" for retaliatory treatment by an "insured" due to the exercise of rights granted under any such law.

With respect to determining the applicability of the above Exclusions, no "wrongful act" or knowledge possessed by an "insured" shall be imputed to any other "insured" to determine if coverage is available, except that facts regarding a "wrongful act" or knowledge possessed by the level of management responsible for making policy with regard to a "wrongful act" will be imputed to the "insured entity".

### SECTION III - LIMIT OF INSURANCE AND DEDUCTIBLE

A.   The Limits of Insurance shown in the Part II Declarations and the rules below fix the most we will pay regardless of the number of:

   1.   "Insureds" under this Coverage Part; or

   2.   "Claims" made or suits brought on account of "wrongful acts" or otherwise; or

   3.   Persons or organizations making "claims" or bringing suits.

B.   Our liability shall apply only to that part of each covered "loss" which is excess of the Deductible amount specified in the Part II Declarations and such Deductible shall be borne by the "insureds".

BC 101 03 99                                                                        Page 4 of 21

C. "Defense costs" incurred by us or by the "insured" with our written consent are part of and not in addition to the Limit of Insurance set forth in the Part II Declarations. Our payment of "defense costs" reduces the Limit of Insurance.

D. Our maximum aggregate liability for all "loss" resulting from all "claims" under this Coverage Part shall be the Limit of Insurance set forth in the Part II Declarations.

## SECTION IV - SUPPLEMENTARY PAYMENTS

We will pay with respect to any "claim" we defend:

A. The cost of any appeal bond, attachment bond, or any similar bond, but only for bond amounts within the applicable Limit of Insurance; provided, however, we do not have to furnish these bonds; and

B. All reasonable expenses incurred by the "insured" at our request to assist us in the investigation or defense of the "claim", including actual loss of earnings up to $250 a day because of time off from work; and

C. Prejudgment interest awarded against the "insured" on that part of the judgment we pay; provided, however, if we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer; and

D. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limits of Insurance

## SECTION V - DEFINITIONS

Where set forth in quotes in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

A. "Benefits" means perquisites, fringe benefits, payments in connection with a "employee" benefit plan and any other payment, other than salary or wages, to or for the benefit of an "employee" arising out of the employment relationship.

B. "Claim" means a civil, administrative or arbitration proceeding commenced by the service of a complaint or charge, which is brought by any past, present or prospective "employee(s)" of the "insured entity" against any "insured" for:

   1. Wrongful termination of employment; or

   2. Breach of any oral or written employment contract or quasi-employment contract except for that part of any express contract of employment or an express obligation to make payments in the event of the termination of employment; or

   3. Employment related misrepresentation; or

   4. Violation of any federal, state or local law that concerns employment discrimination including sexual harassment involving unwelcome sexual advances, requests for sexual favors or other verbal or physical acts of a sexual nature that:

      a. Are made a condition of employment; or

      b. Are used as a basis for employment decisions; or

      c. Create a work environment that interferes with performance; or

   5. Wrongful failure to employ or promote; or

   6. Wrongful discipline; or

   7. Wrongful deprivation of a career opportunity; or

   8. Negligent evaluation; or

   9. Employment related "personal injury"; or

   10. Wrongful failure to grant tenure; or

   11. Employment related wrongful infliction of emotional distress; or

   12. Violation of the Family Medical Leave Act;

BIC 101 03 99

06/25/2007 16:25 FAX 7705320608                    SIDNEY O SMITH                              ☒012

including any actual or alleged assault, battery, loss of consortium, negligent hiring, supervision, pro-motion or retention in connection with subparagraphs 1. through 12. above.

C.   "Employee" includes, but is not limited to, part-time, seasonal, volunteer or contingent workers as deter-mined by federal, state or local law.

D.   "Executive officer" means a person holding any of the officer positions created by the "insured entity's" charter, constitution, by-laws or any other similar governing document.

E.   "Insureds" means:

   1.   If the "insured entity" is:

      a.   An individual, the individual and such individual's spouse, but only with respect to the conduct of a business of which the individual is sole owner; or

      b.   A partnership or joint venture, the partnership or joint venture and its past and present members and partners and their spouses, but only with respect to the conduct of the partnership's or joint venture's business; or

      c.   A limited liability company, the limited liability company, its past and present members, but only with respect to the conduct of the limited liability company's business, and its past and present managers, but only with respect to their duties as managers of the limited liability company; or

      d.   An organization other than a partnership, joint venture or limited liability company, the organiza-tion, its past and present "executive officers" and directors, but only with respect to their duties as officers or directors of the organization, and its past and present stockholders, but only with respect to their liability as stockholders; and

   2.   The past and present "employees" of the "insured entity" (other than (a) the "executive officers" of an "insured entity" that is not a partnership, joint venture or limited liability company and (b) the manag-ers of an "insured entity" that is a limited liability company), but only for acts within the scope of their employment with the "insured entity" or while performing duties related to the conduct of the "insured entity's" business; and

   3.   The estates, heirs, legal representatives or assigns of "insureds" who are deceased or have been declared incompetent.

F.   "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, in-cluding damages, judgments, settlements, and "defense costs".

   "Loss" shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, any amount for which an "insured" is not financially liable, compensation earned in the course of employment but not paid by an "insured", or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

   "Loss" shall not include (other than "defense costs"):

   1.   "Benefits" or the equivalent value, however, this provision does not apply to "loss" resulting solely from wrongful termination of employment; or

   2.   Amounts which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an "insured" or the continued employment of the claimant; or

   3.   Front pay, future damages or other future economic relief or the equivalent thereof, if the "insured" is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an "employee".

G.   "Personal injury" means injury, other than bodily injury, arising out of one or more of the following offenses:

   1.   False arrest, detention or imprisonment; or

   2.   Oral or written publication of material that libels or slanders a past, present or prospective "em-ployee"; or

   3.   Invasion of a past, present or prospective "employee's" right of privacy.

H.   "Subsidiary" means any entity which is more than 50% owned by the "insured entity" of Coverage Part II directly or indirectly at the Coverage Part inception date.

BC 101 03 99                                                                                                           Page 6 of 21

i.   "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part II Declarations and prior to the end of the "policy period" by an "insured" or any person for whose acts the "insured" is legally liable.

## PART III

### TRUSTEE AND FIDUCIARY LIABILITY AND EMPLOYEE BENEFITS ADMINISTRATION COVERAGE FOR FINANCIAL INSTITUTIONS

In consideration of the payment of the premium, in reliance on all statements in the "proposal" and all other information provided to us and subject to all the provisions of this policy, including the General Declarations, the Part III Declarations and Coverage Part V General Provisions, we and the "insureds" agree as set forth below.

### SECTION I - INSURING AGREEMENT

We will pay on behalf of the "insureds" all "loss" which they shall be legally obligated to pay resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act". We will have the right and duty to defend the "insureds" against any such "claim".

### SECTION II - EXCLUSIONS

A. We are not liable to pay, indemnify or defend any "claim":

   1. Arising out of the failure to effect or maintain any insurance or bonds or to effect or maintain adequate limits of coverage of insurance or bond on the assets or obligations of the "plan"; or

   2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged obligation of any "insured" under any workers' compensation, unemployment insurance, social security, disability benefits or similar law; or

   3. Which also falls under Coverage Part II unless the "claim" is for discrimination in violation of the Employee Retirement Income Security Act of 1974 as amended; or

   4. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the service of any of the "insureds" as a fiduciary or administrator of any plan other than the "plan" or the status of any of the "insureds" as a fiduciary of such other plan.

B. We are not liable to pay for or indemnify that part of "loss" other than "defense costs":

   1. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the failure to collect contributions owed by an employer to the "plan" unless such failure is due to the negligence of any of the "insureds"; or

   2. Which constitutes the return or reversion of any contributions or assets of the "plan" to an employer.

The "wrongful act" of any of the "insureds" shall not be imputed to any other of the "insureds" for the purpose of determining the applicability of the above Exclusions.

### SECTION III - LIMIT OF INSURANCE AND DEDUCTIBLE

A. We will pay 100% of "loss" in excess of the Deductible amount set forth in the Part III Declarations up to the Limit of Insurance set forth in the Part III Declarations.

B. The Deductible amount set forth in the Part III Declarations shall apply to each and every "claim". The Deductible shall be paid by the "insureds".

C. "Defense costs" shall be part of and not in addition to the Limit of Insurance. "Defense costs" paid by the "insureds" shall be applied against the Deductible.

D. Our maximum aggregate liability for all "loss" resulting from all "claims" under this Coverage Part shall be the Limit of Insurance set forth in the Part III Declarations.

### SECTION IV - DEFINITIONS

Where set forth in quotes in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

A. "Administration" means:

   1. Giving counsel to participants or beneficiaries of the "plan"; and

   2. Interpreting the "plan"; and

   3. Handling records of the "plan"; and

BC 101 03 99

Page 8 of 21

06/25/2007 16:26 FAX 7705320608                    SIDNEY O SMITH                              ☑015

   4.   Effecting enrollment, termination, or cancellation of participants under the "plan".

B.   "Claim" means any proceeding initiated against any of the "insureds" before any governmental body
     which is legally authorized to render an enforceable judgment or order for money damages or other relief,
     including any appeal from such proceeding.  "Claim" shall not include any criminal proceeding or any
     internal appeal process provided for in the "plan" documents or otherwise required by law.

C.   "Insureds" means:

   1.   The "plan"; and

   2.   The "sponsor"; and

   3.   Any past, present, or future director, officer, or employee of the "sponsor" or of the "plan" while acting
        in their capacities as such; and

   4.   Any individual trustee named in Item 9. of the "proposal" while acting in a fiduciary capacity for the
        "plan" provided such individual trustee is not prohibited by law from acting as a fiduciary and is not a
        firm, corporation, or partnership.

   including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or
   bankruptcy.

D.   "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to
     pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, in-
     cluding damages, judgments, settlements, and "defense costs".

   "Loss" shall not include:

   1.   Taxes, criminal or civil fines, or penalties imposed by law except for the 5% or less or 20% or less civil
        penalties imposed upon any of the "insureds" as a fiduciary under Sections 502(i) or 502(l), respec-
        tively, of the Employee Retirement Income Security Act of 1974 as amended; or

   2.   Punitive or exemplary damages or any multiplied damage award in excess of the amount so multi-
        plied; or

   3.   Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be con-
        strued; or

   4.   Any amount for which the "insureds" are not financially liable whether the "insureds" are absolved
        from payment by any covenant, agreement, court order or otherwise; or

   5.   Benefits due or to become due under the terms of the "plan" except to the extent that recovery for
        such benefits is based on a "wrongful act" and the payment constitutes a personal obligation of the
        "insured".

E.   "Plan" means any employee benefit plan named in the "proposal" and all future plans provided the "in-
     sureds" provide written notice to us of the acquisition of such plan within 60 days of such acquisition and
     pay any additional premium required.

F.   "Sponsor" means the "insured entity" and any "subsidiary".

G.   "Subsidiary" means any entity which is more than 50% owned by the "insured entity" of Coverage Part III
     directly or indirectly at the Coverage Part inception date.

H.   "Wrongful act" means:

   1.   Any actual or alleged breach of fiduciary duty, neglect, error, misstatement, misleading statement,
        omission or other act done or wrongfully attempted by the "insureds" in the discharge of their duties
        solely in their capacity as:

        a.   A fiduciary of the plan (as the term fiduciary is defined in the Employee Retirement Income Se-
             curity Act of 1974 and amendments thereto) in connection with the management and/or admin-
             istration of the "plan" or assets of the "plan"; or

        b.   An authorized agent of the "sponsor" with respect to the "administration" of the "plan"; or

2.  Any matter claimed against any of the "insureds" solely by reason of their fiduciary capacity with the "plan" or by reason of their capacity as authorized agent of the "sponsor" with respect to the "administration" of the "plan";

provided the breach of fiduciary duty, neglect, error, misstatement, misleading statement, omission or other act or the conduct that is the subject of such matter was committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part III Declarations and prior to the end of the "policy period".

PART IV

### TRUST DEPARTMENT ERRORS AND OMISSIONS COVERAGE
### FOR FINANCIAL INSTITUTIONS

In consideration of the payment of the premium, in reliance on all statements in the "proposal" and all other information provided to us and subject to all the provisions of this policy, including the General Declarations, the Part IV Declarations and Coverage Part V General Provisions, we and the "insureds" agree as set forth below.

### SECTION I - INSURING AGREEMENT

We will pay on behalf of the "insureds" all "loss" which they shall be legally obligated to pay resulting from any "claim" first made during the "policy period", or any "extended reporting period" included in or endorsed to the policy, for a "wrongful act". We will have the right and duty to defend the "insureds" against any such "claim".

### SECTION II - EXCLUSIONS

A.  We are not liable to pay, indemnify or defend any "claim" based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged:

   1.  Discrimination by any of the "insureds" or by any person for whose actions the "insureds" are legally responsible; or

   2.  Conflict of interest or bad faith acts by any of the "insureds" or by any person for whose actions the "insureds" are legally responsible; or

   3.  Violation of the responsibilities, obligations or duties as a receiver, trustee in bankruptcy, or assignee for the benefit of creditors; or

   4.  Disputes involving fees or charges for the services of the "insureds"; or

   5.  Mechanical, electronic or programming malfunction of business machines or systems; or

   6.  Failure to effect or maintain any insurance or bond including the failure to effect or maintain adequate limits of coverage of insurance or bond on the assets or third party liability of any customer or client; or

   7.  Bankruptcy of or suspension of payment by any bank or banking firm or any broker or dealer in securities or commodities; or

   8.  Error in funding or method of funding, or failure to fund any plan or trust; or

   9.  Violation of federal or state securities laws; or

   10. Bankruptcy or insolvency of the "company"; or

   11. Violation of the Employee Retirement Income Security Act of 1974 as amended or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law in connection with any pension or welfare plan established for the benefit of employees of the "company"; or

   12. Depreciation or failure to appreciate in value of any investments or representation, guarantee or warranty by or on behalf of any of the "insureds" concerning the performance of such investments; or

   13. Act, error or omission involving the merger, purchase or acquisition of another entity by the "company" or any purchase or sale transaction in the shares of the "company" except to the extent that the purchase or sale was made with the specific prior instructions of a customer or client of the "company".

B.  We are not liable to pay, indemnify or defend any "claim":

   1.  Brought or maintained by, on behalf of or at the behest of any security holder of the "company" if the "claim" is in any way related to any interest in the security; or

   2.  Brought or maintained by, on behalf of or at the behest of any of the "insureds", or any entity under common control with the "company"; provided, however, this exclusion does not apply to any "claim" brought or maintained by any of the "insureds" or any entity under common control with the "company" for contribution or indemnity, if such "claim" for contribution or indemnity directly results from another "claim" covered by this Coverage Part; or

BC 101 03 99                                                                                   Page 11 of 21

    3.  Brought or maintained by or at the behest of any federal or state government or government entity except if the government or government entity is acting solely in the capacity of a customer or client or on behalf of a customer or client of the "company".

The "wrongful act" of any one of the "insureds" shall not be imputed to any other of the "insureds" for the purpose of determining the applicability of the above Exclusions.

## SECTION III - LIMIT OF INSURANCE AND DEDUCTIBLE

**A.** We will pay 100% of "loss" in excess of the Deductible amount set forth in the Part IV Declarations up to the Limit of Insurance set forth in the Part IV Declarations.

**B.** The Deductible amount set forth in the Part IV Declarations shall apply to each and every "claim". The Deductible shall be paid by the "insureds".

**C.** "Defense costs" shall be part of and not in addition to the Limit of Insurance set forth in the Part IV Declarations. "Defense costs" we pay shall reduce the Limit of Insurance. "Defense costs" paid by the "insureds" shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all "loss" resulting from all "claims" under this Coverage Part shall be the Limit of Insurance set forth in the Part IV Declarations.

## SECTION IV - DEFINITIONS

Where set forth in quotes in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** "Claim" means any proceeding initiated against any of the "insureds" before any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief, including any appeal from such proceeding.

**B.** "Company" means the "insured entity" and any "subsidiary".

**C.** "Directors, officers and employees" means all persons who were, now are, or shall be directors, officers or employees of the "company", including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

**D.** "Insureds" means the "company" and the "directors, officers and employees".

**E.** "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

    "Loss" shall not include:

    1.  Taxes, criminal or civil fines, or penalties imposed by law; or

    2.  Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied; or

    3.  Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed; or

    4.  Any amount which is not otherwise reimbursable to the "insureds" by the trust, estate, plan, fund, or similar entity for which the "insureds" were acting as a fiduciary.

**F.** "Subsidiary" means any entity which is more than 50% owned by the "insured entity" of Coverage Part IV directly or indirectly at the Coverage Part inception date.

**G.** "Trust services" means the activities of the "insureds" for or on behalf of any client or customer of the "company" solely in their capacity as:

    1.  Executor or administrator of estates, administrator of guardianships, or trustee under personal or corporate trust agreements; or

    2.  Custodian, depositary, or managing agent for securities or real property; attorney-in-fact; escrow agent; transfer or dividend disbursing agent; registrar, fiscal, or paying agent; tax withholding agent; exchange agent; redemption or subscription agent; or warrant agent; and only to the extent they are performing functions usually performed by the trust department of a bank.

H.   "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part IV Declarations and prior to the end of the "policy period" by the "insureds" in the performance of "trust services".

## PART V

### GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY

Throughout this policy, the words "we", "us" and "our" refer to The Cincinnati Insurance Company.

### SECTION I - EXCLUSIONS

We are not liable to pay, indemnify or defend any "claim":

A.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.  The actual, alleged, or threatened discharge, dispersal, seepage, migration, emission, release or escape of "pollutants"; or

    2.  Any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize "pollutants", including but not limited to "claims" alleging damage to a "policy insured";

    provided, however, this exclusion shall not apply to any "claim" under Coverage Part II for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of matters discribed in Exclusion I.A.1. or I.A.2. above; or

B.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.  Any "wrongful act" or any fact, circumstance or situation which has been the subject of any notice given prior to the "policy period" under any other policy; or

    2.  Any other "wrongful act" whenever occurring, which, together with a "wrongful act" which has been the subject of such notice, would constitute "interrelated wrongful acts"; or

C.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any of the "policy insureds" or any person for whose actions the "policy insureds" are legally responsible committing in fact any deliberately fraudulent, dishonest, criminal or malicious act or omission or willful or reckless violation of any statute, rule, regulation, agreement, or judicial or regulatory order; or

D.  For the return by any of the "policy insureds" of any remuneration paid to such "policy insureds" if payment of such remuneration shall be held by the court to have been in violation of law, provided, however, this exclusion shall not apply to any "claim" under Coverage Part II; or

E.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any of the "policy insureds" or any person for whose actions the "policy insureds" are legally responsible gaining in fact any profit or advantage to which they were not legally entitled, provided, however, this exclusion shall not apply to any "claim" under Coverage Part II; or

F.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any "wrongful act" committed, attempted or allegedly committed or attempted prior to the "policy period" of the applicable Coverage Part if:

    1.  Prior to the earlier of the following dates:

        a.  The inception of the applicable Coverage Part, or

        b.  The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement,

    any of the "policy insureds" knew or should have reasonably foreseen that such "wrongful act" might be the basis of a "claim"; or

    2.  There is a previous policy under which the "policy insureds" are entitled to coverage for such "claim"; or

G.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending litigation as of the Prior and/or Pending Date stated in the Declarations for the applicable Coverage Part or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, regardless of the legal theory asserted in such "claim"; or

H.  For actual or alleged:

BC 101 03 99                                                          Page 14 of 21

1. Bodily injury, sickness, disease, or death of any person, assault, battery, mental anguish, or emotional distress; or

2. "Property damage", including but not limited to physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money; or

3. Invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel, slander or defamation; or

4. Interference with or damage to business reputation;

provided, however, with respect to Coverage Part II, this exclusion shall apply only to "claims" for actual or alleged bodily injury, sickness, disease, or death of any person or "property damage"; or

I. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving legal liability assumed by any of the "policy insureds" under the terms, conditions or warranties of any oral or written contract or agreement, or by virtue of any waiver or release from liability of any third party, except to the extent:

1. The liability would have attached to any such "policy insureds" in the absence thereof; or

2. With respect to any "claim" under Coverage Part III, the liability was assumed in accordance with the agreement or declaration of trust pursuant to which the "plan" was established; or

J. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the hazardous properties, including radioactive, toxic or explosive properties, of any nuclear material. Nuclear material means any source material, special nuclear material, or byproduct materials as those terms are defined under the Atomic Energy Act of 1954 or any amendments thereto.

With respect to determining the applicability of the above Exclusions, no "wrongful act" or knowledge possessed by any one of the "policy insureds" shall be imputed to any other of the "policy insureds" to determine if coverage is available, except that facts regarding a "wrongful act" or knowledge possessed by the level of management responsible for making policy with regard to a "wrongful act" will be imputed to the "insured entity".

## SECTION II - LIMITS OF INSURANCE, DEDUCTIBLES, MULTIPLE CLAIMS AND EXHAUSTION

A. If a single "claim" is covered under more than one Coverage Part, then our maximum liability for all "loss" resulting from such "claim" shall be the largest applicable Limit of Insurance available under any one of the applicable Coverage Parts.

B. The Deductibles for each Coverage Part apply separately to the respective Coverage Parts. If a single "claim" is covered under more than one Coverage Part, the applicable Deductibles shall be applied separately to the part of the "claim" covered by each Coverage Part and the sum of the Deductibles so applied shall constitute the total Deductible for such "claim".

C. If the aggregate Limit of Insurance for a particular Coverage Part is exhausted, then all of our obligations under that Coverage Part shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion.

D. The Limits of Insurance of each Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" set forth in the Declarations of each respective Coverage Part, unless the "policy period" of the respective Coverage Part is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period of the respective Coverage Part for purposes of determining the Limits of Insurance.

E. Regardless of the number of policies or Coverage Parts involved, all "claims" based upon or arising out of the same "wrongful act" or any "interrelated wrongful acts" shall be considered a single "claim". Each "claim" shall be deemed to be first made at the earliest of the following times:

1. When notice of the earliest "claim" arising out of such "wrongful acts" or "interrelated wrongful acts" is received in writing by a "policy insured" or by us, whichever comes first; or

2. When notice pursuant to Section V of the General Provisions of a "wrongful act" giving rise to such "claim" is given.

F. In the event that more than one of the "policy insureds" is included in the same "claim", the total amount of "loss" resulting from such "claim" and the Deductible shall be apportioned pro-rata among the "policy insureds" in proportion to their respective "loss" unless otherwise mutually agreed upon by the "policy insureds" and us.

EIC 101 03 99

Page 15 of 21

## SECTION III - DUTIES OF THE POLICY INSUREDS IN THE EVENT OF A CLAIM

As a condition precedent to coverage under this policy:

A.  The "policy insureds" shall give us written notice of any "claim" made against any of the "policy insureds" for a "wrongful act" as soon as practicable, and shall give such information and cooperation as we may reasonably require, including but not limited to a description of the "claim", the nature of the alleged "wrongful act", the nature of the alleged injury, the names of the claimants, and the manner in which the "policy insureds" first became aware of the "claim". As soon as practicable, the "policy insureds" shall furnish us with copies of reports, investigations, pleadings and other papers in connection with the "claim";

B.  The "policy insureds" shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a "claim" the "policy insureds" will do nothing which may prejudice our position or our potential or actual rights of recovery;

C.  The "policy insureds" shall not settle any "claim", incur any "defense costs" or otherwise assume any obligation or admit any liability with respect to any "claim" without our prior written consent, which shall not be unreasonably withheld. We shall be entitled to full information and all particulars we may request in order to reach a decision as to such consent. We shall not be liable for any settlement, "defense costs", assumed obligation or admission to which we have not consented.

## SECTION IV - DEFENSE, INVESTIGATION AND SETTLEMENT

A.  We will have the right and duty to defend the "policy insureds" against any "claim"; however, we will have no duty to defend the "policy insureds" against any "claim" seeking damages to which this insurance does not apply.

B.  We may make any investigation we deem necessary and may, with the consent of the "policy insureds" named in connection with the "claim", make any settlement of any "claim" we deem expedient. If the "policy insureds" withhold consent to such settlement, our liability for all "loss" in connection with such "claim" shall not exceed the amount for which we could have settled such "claim" plus "defense costs" which have accrued up to the date such settlement was proposed in writing by us to the "policy insureds" subject to the provisions concerning Limits of Insurance, Multiple Claims and Deductibles of this policy.

C.  Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense and/or payment of judgments or settlements of covered "claims".

## SECTION V - NOTICE OF A WRONGFUL ACT

If prior to the end of the "policy period" of the applicable Coverage Part, any of the "policy insureds" first become aware of a specific "wrongful act" they believe is likely to give rise to a "claim", and if any of the "policy insureds" give us written notice as soon as practicable, but prior to the end of the "policy period" of the applicable Coverage Part, of:

A.  The specific "wrongful act"; and

B.  The injury or damage which has or may result therefrom; and

C.  The circumstances by which the "policy insureds" first became aware thereof,

then any "claim" subsequently made arising out of such "wrongful act" shall be deemed to have been made when notice of the "wrongful act" was first given.

## SECTION VI - DIRECTION OF CORRESPONDENCE TO US

All notices and other materials provided to us pursuant to the terms of this policy shall be directed to:

Casualty Claims Manager
The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, OH 45250-5496

## SECTION VII - PROPOSAL

The "proposal" is the basis of this policy and is incorporated in and constitutes a part of this policy. A copy of the "proposal" is attached hereto. It is agreed by the "policy insureds" that the statements in the "proposal" are their representations, that they are material and that this policy is issued in reliance upon the truth of such representations; provided, however, that except for material facts or circumstances know to any person who subscribed the Application Form, any misstatement or omission in the "proposal" in respect of a specific "wrongful act" or the knowledge of any of the "policy insureds" of any matter which such "policy insured" has

**BC 101 03 99**                                                                 **Page 16 of 21**

reason to believe may give rise to a future "claim" shall not be imputed to any of the other "policy insureds" who is a natural person for purposes of determining the validity of this policy as to such other "policy insureds".

## SECTION VIII - CHANGES IN EXPOSURE

### A. Change in Ownership of Insured Entity

If during the "policy period" of the applicable Coverage Part:

1. An "insured entity" consolidates with or merges into another entity such that such "insured entity" is not the surviving entity; or

2. Greater than 50% of the assets of an "insured entity" are sold; or

3. Another entity or person or group of entities and/or persons acting in concert acquires more than 50% ownership of an "insured entity",

then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such "insured entity" and its "insureds" until the end of the applicable "policy period" or any applicable "extended reporting period", but only with respect to "claims" for "wrongful acts" committed, attempted or allegedly committed or attempted prior to such transaction. The "named insured" shall give written notice to us as soon as practicable, but in no event later than 90 days after such transaction.

### B. Cessation of Subsidiaries

If during the "policy period" of the applicable Coverage Part any entity ceases to be a "subsidiary" as defined in the applicable Coverage Part, then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such entity and its "insureds" until the end of the applicable "policy period" or any applicable "extended reporting period", but only with respect to "claims" for "wrongful acts" committed, attempted or allegedly committed or attempted prior to the date such entity ceases to be a "subsidiary". The "named insured" shall give written notice to us a soon as practicable, but in no event later than 90 days after the entity ceases to be a "subsidiary".

### C. Termination of Plan

If prior to or during the "policy period" of Coverage Part III the "sponsor" terminates a "plan", then, subject to all the other provisions of this policy, coverage under Coverage Part III shall continue to apply to such "plan" and its "insureds" until the end of the applicable "policy period" or any applicable "extended reporting period", but only with respect to "claims" for "wrongful acts" committed, attempted or allegedly committed or attempted prior to the date such "plan" was terminated. The "named insured" shall give written notice to us as soon as practicable, but in no event later than 90 days after the "plan" is terminated.

### D. Acquisition or Formation of Entity

If during the "policy period" of the applicable Coverage Part an "insured entity" newly acquires or forms another entity (other than a partnership, joint venture or limited liability company) over which such "insured entity" maintains more than 50% ownership and which has no other similar insurance available, for the purpose of coverage under the Coverage Part applicable to such "insured entity", the newly acquired or formed entity shall be deemed to be an "insured entity". However,

1. Coverage is afforded only until the 90th day after the "insured entity" acquires or forms the entity or the end of the "policy period" of the applicable Coverage Part, whichever is earlier; and

2. Coverage does not apply to "claims" for "wrongful acts" committed, attempted or allegedly committed or attempted prior to the date the "insured entity" acquired or formed the entity unless we agree, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for such "claims" and the "named insured" pays any additional premium we require for the endorsement.

## SECTION IX - OTHER INSURANCE ISSUED BY ANOTHER INSURER

This insurance is primary except when all or any part of "loss" is also insured under any other prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies) applies to any "claim", then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply excess of this policy.

When this policy is excess:

BC 101 03 99

A.  We will have no duty to defend any "claim" when any other insurer has that duty.  If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the "policy insureds'" rights against such other insurer; and

B.  We will pay only our share of the amount of the "loss", if any, that exceeds the sum of:

1.  The total amount that all such other insurance would pay for the "loss" in the absence of this policy; and

2.  The total of all deductible and self-insured amounts under all such other insurance.

## SECTION X - MEDIATION AND ALLOCATION

A.  Any dispute including but not limited to tort claims or contract claims between a "policy insured" and us arising out of or relating to this policy shall be submitted to non-binding mediation prior to commencement of an action between the parties.  The mediator shall be chosen by agreement.  If the parties cannot agree upon a mediator, the mediator shall be chosen by the American Arbitration Association.

B.  If both "loss" covered by this policy and loss not covered by this policy are incurred, either because a "claim" against a "policy insured" includes both covered and uncovered matters or because a "claim" is made against both a "policy insured" and others, we and the "policy insureds" shall use our best efforts to agree upon a fair and proper allocation of such amount between covered "loss" and uncovered loss.

C.  If we and the "policy insureds" cannot agree as to matters in Section X.B. above prior to a judgment or finding in the civil or administrative proceeding dealing with "claims" against the "policy insureds", the parties agree that they will, to the extent it is within their control, require that the allocation between covered "loss" and uncovered loss is made in such civil or administrative proceeding.  Such efforts shall include but are not limited to the submission of special interrogatories to the finder of fact in such proceeding.  Such efforts shall not require us to become a party to such civil or administrative proceeding.

D.  Notwithstanding Section X.C. above, if we and the "policy insureds" cannot agree as to matters in Section X.B. above prior to a judgment or finding in any civil or administrative proceeding in which such issues are decided, we may at any time before or after mediation under Section X.A. above settle all "claims" against any or all "policy insureds".  Following such settlement, any dispute between us and the "policy insureds" as to the proper allocation of covered and uncovered matters under Section X.B. above shall be submitted to non-binding mediation prior to the commencement of an action between the parties.  In any event, only one mediation as to the same issues shall be required.

## SECTION XI - ACTION AGAINST US

A.  No action shall be taken against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy and until the obligation of the "policy insureds" to pay shall have been finally determined, either by an adjudication against them or by written agreement of the "policy insureds", the claimant and us.  Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.  Bankruptcy or insolvency of a "policy insured" or of a "policy insured's" estate shall not relieve us of any of our obligations hereunder.

B.  No person or organization shall have any right under this policy to join us as a party to any "claim".  Neither the "policy insureds" nor their legal representative shall implead us in any "claim".

## SECTION XII - SUBROGATION

In the event of any payment under this policy, we shall be subrogated to all of the rights to recovery of the "policy insureds" to the extent of such payment.  The "policy insureds" shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable us to effectively bring suit in the name of the "policy insureds".

## SECTION XIII - ASSIGNMENT

Assignment of interest under this policy shall not bind us unless our consent is endorsed hereon.

## SECTION XIV - CONFORMITY TO STATUTE

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy are hereby amended to conform to such laws.

## SECTION XV - ENTIRE AGREEMENT

By acceptance of this policy, we and the "policy insureds" agree that this policy (including the "proposal") and any written endorsements attached hereto constitute the entire agreement between the parties.

BC 101 03 99

## SECTION XVI - REPRESENTATION BY NAMED INSURED

The first "named insured" shall act on behalf of all of the "policy insureds" in purchasing this policy and for any purposes under the policy.

## SECTION XVII - CANCELLATION OR NON-RENEWAL

A. This policy or any of its Coverage Parts may be cancelled by the first "named insured" at any time by providing written notice to us or by surrendering this policy to us.

B. This policy or any of its Coverage Parts may not be cancelled by us for any reason except for non-payment of premium when due. If we cancel the policy or any of its Coverage Parts, written notice shall be provided to the first "named insured" stating when, not less than 10 days thereafter, the cancellation shall be effective. Such notice may be provided by certified mail, other first class mail, facsimile, or courier, at the address stated in Item 1. of the General Declarations, or by delivery. The dispatch of notice shall be sufficient proof of notice and the coverage that is the subject of the cancellation notice shall terminate at the date and hour specified in such notice.

C. If this policy or any of its Coverage Parts are cancelled:

   1. By the first "named insured", we shall retain the customary short-rate portion of the premium; or

   2. By us or on our behalf, we shall retain the pro-rata portion of the applicable premium. Payment or tender by us of any unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

D. If we elect not to renew this policy or a particular Coverage Part, we shall provide the first "named insured" with no less than 60 days advance notice.

E. If any of the foregoing periods of limitation relating to the giving of notice are prohibited or made void by any law controlling the construction thereof, such periods shall be amended so as to equal the minimum period of limitation permitted by such law.

## SECTION XVIII - EXTENDED REPORTING PERIODS

A. Upon termination of any of the Coverage Parts for any reason, other than cancellation for non-payment of premium, we may provide one or more Extended Reporting Periods as described below.

B. The Extended Reporting Periods do not extend the "policy period" or change the scope of coverage provided. They extend the "claims" reporting period.

C. The Extended Reporting Periods extend coverage to "claims" first made during the length of time covered by the applicable Extended Reporting Period provided the "wrongful act" was committed, attempted or allegedly committed or attempted prior to the end of the "policy period" of the applicable Coverage Part, and all such "claims" shall be subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions. Such "claims" must be reported in writing to us prior to the expiration of the applicable Extended Reporting Period.

D. A 60-day Basic Extended Reporting Period is automatically provided without additional charge. The Basic Extended Reporting Period starts immediately after the end of the "policy period" of the applicable Coverage Part.

The Basic Extended Reporting Period does not reinstate or increase the Limits of Insurance of the applicable Coverage Part. Our total liability shall not exceed the Limit of Insurance shown in the applicable Declarations for the last consecutive annual period and/or any remaining period of less than 12 months in which coverage is provided hereunder.

E. A 12-month Supplemental Extended Reporting Period may be available, but only by endorsement and for an extra premium charge. This supplemental period starts when the Basic Extended Reporting Period, as set forth in Section XVIII.D. above, ends. The first "named insured" must give us a written request for the Supplemental Extended Reporting Period within 60 days of the termination of this insurance. The Supplemental Extended Reporting Period will not go into effect unless the first "named insured" pays the additional premium promptly when due.

If the Supplemental Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit of Insurance, but only for "claims" first made during the Supplemental Extended Reporting Period. The Supplemental Aggregate Limit of Insurance will be equal to the dollar amount of the aggregate Limit of Insurance shown in the Declarations for the applicable Coverage Part.

BC 101 03 99

We will determine the additional premium charge for the Supplemental Extended Reporting Period in accordance with our rules and rates. In doing so, we may take into account the following:

1.  The exposure insured;

2.  Previous types and amounts of insurance; and

3.  Other related factors.

The additional premium will not exceed 200% of the expiring annual premium for the applicable Coverage Part.

The Supplemental Extended Reporting Period endorsement shall set forth any terms that differ from the basic coverage applicable to the Supplemental Extended Reporting Period.

F.  Any Extended Reporting Period will immediately terminate on the effective date and hour of any other insurance issued to the "policy insureds" which replaces this insurance. If the first "named insured" notifies us of the effective date of the other insurance, we will send the first "named insured" a refund of any pro-rata unearned premium.

## SECTION XIX - COVERAGE TERRITORY

This policy applies to any "claim" for a "wrongful act" committed, attempted or allegedly committed or attempted anywhere.

## SECTION XX - DEFINITIONS

Where set forth in quotes in this policy, whether in singular or in plural, the following terms shall have the meanings indicated. Any other terms set forth in quotes in the General Provisions will have the meanings indicated in the applicable Coverage Parts.

A.  "Defense costs" means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the "policy insureds" or reimbursed to any of the "policy insureds" by us, resulting solely from the investigation, adjustment, defense and appeal of any "claim".

    "Defense costs" shall not include:

    1.  With respect to Coverage Part II only, expenses explicitly provided for under Section IV of Coverage Part II; or

    2.  Salaries, wages, overhead or expense of our employees or any "policy insureds'" directors, officers or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim"; or

    3.  Any amount covered by the duty to defend obligation of any other insurer.

B.  "Extended reporting period" means the periods of time described in Section XVIII of the General Provisions.

C.  "Insured entity" means with respect to the coverage under a particular Coverage Part, the entity named in Item 1. of the respective Declarations for such Coverage Part.

D.  "Interrelated wrongful acts" means all causally connected "wrongful acts".

E.  "Named insured" means the entity named in Item 1. of the General Declarations.

F.  "Policy insureds" means the natural persons and entities insured under each respective Coverage Part for which coverage is set forth in the Declarations for the policy, but shall not include any current or past partnership, joint venture or limited liability company unless such partnership, joint venture or limited liability company is shown as an "insured entity" in the Declarations of the applicable Coverage Part.

G.  "Policy period" means the period from the inception date to the expiration date as set forth in Item 3. of the Part I Declarations and Item 2. of the Part II, III and IV Declarations, or to the earlier date of cancellation of the applicable Coverage Part.

H.  "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals, petroleum products and their by-products and waste. Waste includes material to be recycled, reconditioned or reclaimed.

    "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

I.  "Property damage" means:

BC 101 03 99                                                                          **Page 20 of 21**

1.  Physical injury to tangible property, including all resulting loss of use of that property; or

2.  Loss of or loss of use of tangible property that is not physically injured.

J.  "Proposal" means:

1.  The Application Form for this policy and any applications for any policies for which this policy provides renewal coverage in whole or in part; and

2.  Any materials submitted with the Application Form and such applications, which shall be maintained on file with us and shall be deemed to be attached hereto as if physically attached.

In witness whereof, we have caused this policy to be signed by our President and Secretary. This policy shall not be valid unless countersigned on the Declarations by our duly authorized representative. This provision does not apply in Arizona, Virginia and Wisconsin.

Kenneth W. Steeh

Secretary

John Schiff Jr

President

BC 101 03 99

06/25/2007 16:30 FAX 7705320608          SIDNEY O SMITH                          @028

ENDORSEMENT

No._____

| Attached to and Forming Part of Policy No. | Issued to Integrity Bancshares, Inc. |
|---|---|
| BCP 873 72 76 | |
| Effective date of Endorsement | |
| 08-28-2006 | |

## SECURITIES ACTION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**FINANCIAL INSTITUTIONS BLUE CHIP POLICY**

1. **PART I - DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTI-TUTIONS, SECTION I - INSURING AGREEMENTS** is amended as follows:

   a. The following phrase is hereby deleted:

      We will have the right and duty to defend the "insureds" against any such "claim".

   b. The following insuring agreement is hereby added:

      D. We will pay on behalf of the "company" all "loss" which the "company" is required to pay resulting from any "securities action" first made during the "policy period" or any "extended reporting period" against the "company" for a "wrongful act".

2. **PART I - DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTI-TUTIONS, SECTION II - EXCLUSIONS** is amended as follows:

   Exclusion D. is deleted and replaced by the following:

   D. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involv-ing the actual or proposed payment by the "company" of allegedly inadequate consideration in con-nection with the "company's" purchase of securities; provided, however, this exclusion shall not apply to "defense costs".

3. **PART I - DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTI-TUTIONS, SECTION IV - DEFINITIONS** is amended as follows:

   a. The following definition is hereby added:

      "Securities action" means any proceeding initiated against any one of the "insureds" before any govern-mental body which is legally authorized to render an enforceable judgment or order for money damages or other relief, including any appeal from such proceeding, which involves a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934, rules or regulations promulgated thereunder, the securi-ties laws of any state or any common law relating to any transaction arising out of, involving or relating to the sale of securities of the "company".

   b. The definition of "claim" is hereby deleted and replaced by the following:

      A. "Claim" means:

         1. Any proceeding initiated against any of the "insureds" before any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other re-lief, including any appeal from such proceeding; or

BC 417 03 99

2. Any "securities action".

c.  The definition of "directors and officers" is hereby deleted and replaced by the following:

C.  "Directors and officers" means:

1.  All persons who were, now are, or shall be directors or officers of the "company"; and

2.  All persons who were, now are, or shall be employees of the "company", but only with respect to a "securities action"; and

3.  The lawful spouse of the directors, officers or employees set forth in the above provisions of this definition, but only to the extent such lawful spouse is a party to any "claim" solely in such person's capacity as a spouse of a director, officer or employee of the "company" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the director, officer or employee and the spouse, or property transferred from the director, officer or employee to the spouse,

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

d.  The definition of "loss" is hereby deleted and replaced by the following:

E.  "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

"Loss" shall not include:

1.  Taxes, criminal or civil fines, or penalties imposed by law; or

2.  Punitive or exemplary damages except if such damages are imposed upon the "company" in a "securities action" and are insurable by law; or

3.  Any multiplied damage award in excess of the amount so multiplied; or

4.  Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

e.  The definition of "wrongful act" is hereby deleted and replaced by the following:

I.  "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part I Declarations and prior to the end of the "policy period" by:

1.  Any of the "directors and officers" in the discharge of their duties solely in their capacity as a director or officer of the "company"; or

2.  Any officers of the "company" who are "directors and officers" in the discharge of their duties solely in their capacity as a director, officer, governor, trustee or in an executive position equivalent to the foregoing in any "outside organization" if the service is performed at the direction of the "company" or with the consent and knowledge of the "company"; or

3.  The "company" in the performance of "professional services"; or

4.  The "company" solely as respects a "securities action".

4.  SECTION V - DEFENSE AND COOPERATION is hereby added to PART I - DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTITUTIONS:

## SECTION V - DEFENSE AND COOPERATION

A.  It shall be the duty of the "insureds" and not our duty to defend "claims", provided that the "insureds" shall only retain counsel as mutually agreed upon with us.

B.  We shall at all times have the right, but not the duty, to associate with the "insureds" in the investigation, defense or settlement of any "claim" to which this policy may apply.

SECTION IV - DEFENSE, INVESTIGATION AND SETTLEMENT of PART V - GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY does not apply to this Coverage Part.

All other provisions of the policy remain unchanged except as herein expressly modified.

BC 417 03 99                                                                    Page 2 of 2

## ENDORSEMENT

No. _____

| Attached to and Forming Part of Policy No.<br>BCP 873 72 76 | Effective date of Endorsement<br>08-28-2006 |
|---|---|
| Issued to<br>Integrity Bancshares, Inc. | |

## BLUE CHIP POLICY CHANGES - GEORGIA

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY**
**FINANCIAL INSTITUTIONS BLUE CHIP POLICY**
**HEALTH CARE INSTITUTIONS BLUE CHIP POLICY**
**PUBLICLY TRADED COMPANY BLUE CHIP POLICY**
**NON - PROFIT ORGANIZATION BLUE CHIP POLICY**

A. The definition of "loss" under **SECTION IV - DEFINITIONS** of **PART I** of the **FINANCIAL INSTITUTIONS BLUE CHIP POLICY , BLUE CHIP POLICY** and the **NON - PROFIT ORGANIZATION BLUE CHIP POLICY** is deleted and replaced by the following:

　　E. "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

　　"Loss" shall not include:

　　1. Taxes, criminal or civil fines, or penalties imposed by law;

　　2. Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied, except to the extent they are insurable under the law pursuant to which this policy is construed; or

　　3. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

B. The definition of "loss" under **SECTION IV - DEFINITIONS** of **PART I** of the **HEALTH CARE INSTITU-TIONS BLUE CHIP POLICY** is deleted and replaced by the following:

　　E. "Loss" means the total amount of money damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

　　"Loss" shall not include:

　　1. Taxes, criminal or civil fines, or penalties imposed by law; 2. Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied, except to the extent they are insurable under the law pursuant to which this policy is construed;

　　3. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed; or

　　4. Any amount for which there is no legal recourse against any "individual insured".

**BC 441 GA 08 03**

**Page 1 of 3**

C.  The definition of "loss" under **SECTION V - DEFINITIONS** of **PART I** of the **PUBLICLY TRADED COMPANY BLUE CHIP POLICY** is deleted and replaced by the following:

   E.  "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

      "Loss" shall not include:

      1.  Taxes, criminal or civil fines, or penalties imposed by law;

      2.  Punitive or exemplary damages except if such damages are imposed upon the "company" in a "securities action" and are insurable by law;

      3.  Any multiplied damage award in excess of the amount so multiplied, except to the extent they are insurable under the law pursuant to which this policy is construed; or

      4.  Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

D.  The definition of "loss" under **SECTION V - DEFINITIONS** of **PART II** is deleted and replaced by the following:

   F.  "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

      "Loss" shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, except to the extent they are insurable under the law pursuant to which this policy is construed, any amount for which an "insured" is not financially liable, compensation earned in the course of employment but not paid by an "insured", or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

      "Loss" shall not include (other than "defense costs"):

      1.  "Benefits" or the equivalent value, however, this provision does not apply to "loss" resulting solely from wrongful termination of employment;

      2.  Amounts which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an "insured" or the continued employment of the claimant; or

      3.  Front pay, future damages or other future economic relief or the equivalent thereof, if the "insured" is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an "employee".

E.  The definition of "loss" under **SECTION IV - DEFINITIONS** of **PART III** is deleted and replaced by the following:

   D.  "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

      "Loss" shall not include:

      1.  Taxes, criminal or civil fines, or penalties imposed by law except for the 5% or less or 20% or less civil penalties imposed upon any of the "insureds" as a fiduciary under Sections 502(i) or 502(l), respectively, of the Employee Retirement Income Security Act of 1974 as amended;

      2.  Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied, except to the extent they are insurable under the law pursuant to which this policy is construed;

      3.  Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed; or

      4.  Any amount for which the "insureds" are not financially liable whether the "insureds" are absolved from payment by any covenant, agreement, court order or otherwise; or

BIC 141 GA 08 03                                                    Page 2 of 3

5.  Benefits due or to become due under the terms of the "plan" except to the extent that recovery for such benefits is based on a "wrongful act" and the payment constitutes a personal obligation of the "insured".

F.  The definition of "loss" under **SECTION IV - DEFINITIONS** of **PART IV** of the **FINANCIAL INSTITUTIONS BLUE CHIP POLICY** is deleted and replaced by the following:

E.  "Loss" means the total amount of monetary damages which the "insureds" become legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, settlements, and "defense costs".

"Loss" shall not include:

1.  Taxes, criminal or civil fines, or penalties imposed by law;

2.  Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied, except to the extent they are insurable under the law pursuant to which this policy is construed;

3.  Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed; or

4.  Any amount which is not otherwise reimbursable to the "insureds" by the trust, estate, plan, fund, or similar entity for which the "insureds" were acting as a fiduciary.

G.  For all Coverage Parts other than **PART I, SECTION IX - OTHER INSURANCE ISSUED BY ANOTHER INSURER** of the **GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY**, is deleted and replaced by the following:

**SECTION IX - OTHER INSURANCE ISSUED BY ANOTHER INSURER**

This insurance is primary except when all or any part of "loss" is also insured under any other prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies, or insurance written specifically to be excess of the insurance provided by this policy) applies to any "claim", then our obligations are limited. Each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

06/25/2007 16:32 FAX 7705320608          SIDNEY OPSMITH                    ☑033

## ENDORSEMENT

No. _____

| Attached to and Forming Part of Policy No.<br>BCP 873 72 76 | Effective date of Endorsement<br>08-28-2006 |
|---|---|

Issued to
**Integrity Bancshares, Inc.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY
FINANCIAL INSTITUTIONS BLUE CHIP POLICY
HEALTH CARE INSTITUTIONS BLUE CHIP POLICY
PUBLICLY TRADED COMPANY BLUE CHIP POLICY
NON - PROFIT ORGANIZATION BLUE CHIP POLICY**

The **GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY** is amended as follows:

**I. SECTION XX - DEFINITIONS** is amended to include the following:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002, and any amendments thereto. The criteria contained in that Act for a "certified act of terrorism" include the following:

1.  The act resulted in aggregate losses in excess of $5 million; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**II. SECTION XXI - APPLICATION OF OTHER EXCLUSIONS** is added:

The inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any "loss" which would otherwise be excluded under this policy, such as "losses" excluded by:

1.  Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination; or

2.  Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the "loss".

**III. SECTION XXII - CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM** is added:

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, and any amendments thereto, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism "losses".

**IV. SUNSET CLAUSE**

If the federal Terrorism Risk Insurance Act of 2002, the Terrorism Risk Insurance Extension Act of 2005, and any amendments and extensions thereto expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of ISO
Properties, Inc., and American Association of Insurance
Services, Inc., with their permission.

BC 456 01 06

# THE CINCINNATI INSURANCE COMPANY

## ENDORSEMENT
No._____

| Attached to and Forming Part of Policy No. BCP - 8737276 | Issued to: Integrity Bancshares, Inc. | Effective date of Endorsement: 08-28-2006 |
|---|---|---|

## POLICY AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY**
**FINANCIAL INSTITUTIONS BLUE CHIP POLICY**
**HEALTH CARE INSTITUTIONS BLUE CHIP POLICY**
**PUBLICLY TRADED COMPANY BLUE CHIP POLICY**

**SECTION XVII - CANCELLATION OR NON RENEWAL, of the GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY is modified as follows:**

Item B. is amended by deleting the sentence "this policy or any of its Coverage Parts may not be cancelled by us for any reason except for non-payment of premium when due".

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____    The Cincinnati Insurance Company

By _____
(Authorized Representative)

F 3132 06 83 A

# THE CINCINNATI INSURANCE COMPANY

### ENDORSEMENT
No. _____

| Attached to and Forming Part of Policy No. BCP-8737276 | Issued to: Integrity Bancshares, Inc. | Effective date of Endorsement: 08-28-2006 |
|---|---|---|

> ### Amended Claim Definition

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY**
**FINANCIAL INSTITUTIONS BLUE CHIP POLICY**
**HEALTH CARE INSTITUTIONS BLUE CHIP POLICY**
**PUBLICLY TRADED COMPANY BLUE CHIP POLICY**

**COVERAGE PART I – DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTITUTIONS, SECTION IV- DEFINITIONS** is amended as follows:

Item A. is amended by adding the following paragraph:

> "Claim" also means any written or oral demand or legal, injunctive, administrative, regulatory or arbitration proceedings and includes any appeal from such proceedings.

**COVERAGE PART II- EMPLOYMENT PRACTICES LIABILITY COVERAGE FOR FINANCIAL INSTITUTIONS, SECTION V-DEFINITIONS** is amended as follows:
Item B. is amended by adding the following paragraph:

> "Claim" also means any written or oral demand or legal, injunctive, administrative, regulatory or arbitration proceedings and includes any appeal from such proceedings.

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____

The Cincinnati Insurance Company

By _____
(Authorized Representative)

P 3132 06 83 B

1

06/25/2007 16:33 FAX 7705320608         SIDNEY O SMITH                    @038

**COVERAGE PART III-TRUSTEE AND FIDUCIARY LIABILITY AND EMPLOYEE BENEFITS ADMINISTRATION COVERAGE FOR FINANCIAL INSTITUTIONS, SECTION IV- DEFINITIONS is amended as follows:**

Item A. is amended by adding the following paragraph:

"Claim" also means any written or oral demand or legal, injunctive, administrative, regulatory or arbitration proceedings and includes any appeal from such proceedings.

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____          The Cincinnati Insurance Company

By _____
                              (Authorized Representative)

F 3132 06 83 B                                                                                        2

# THE CINCINNATI INSURANCE COMPANY

## ENDORSEMENT
No._____

| Attached to and Forming Part of Policy No.<br>BCP - 8737276 | Issued to:<br><br>Integrity Bancshares, Inc. | Effective date of Endorsement:<br>08-28-2006 |
|---|---|---|

### FINANCIAL INSTITUTION COVERAGE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE FOR FINANCIAL INSTITUTIONS BLUE CHIP POLICY**

**SECTION II - EXCLUSIONS of DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE** is modified as follows:

The following Exclusions are deleted in their entirety:

Exclusion F.

☒ **EMPLOYEE COVERAGE** (applicable only if so ☒ indicated)

It is understood and agreed that Coverage Part I, Section IV, Definition D. "Insureds", is amended to include Employees.

☒ **IRA/KEOGH COVERAGE** (applicable only if so ☒ indicated)

It is understood and agreed that the insurance provided, subject to policy terms and conditions, is extended to include coverage for "loss" arising out of the "directors and officers" serving as fiduciaries for any of the HR-10 (Keogh Plans) and/or Individual Retirement Accounts administered by the "company", where such activity is a part of their regularly assigned duties allowed under the trust authority granted to the "company".

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____     The Cincinnati Insurance Company

By_____
(Authorized Representative)

F 3132 06 83 C                                                      Page 1 of 2

☒ **LENDER LIABILITY COVERAGE** (applicable only if so ☒ indicated)

This coverage modifies insurance provided under the following:

**SECTION II – EXCLUSIONS** of **DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE** is modified as follows:

Exclusion E. is deleted in its entirety.

It is further understood and agreed that this policy shall be amended to include coverage for any claim or claims arising out of any "wrongful lending act" related to an extension of credit or refused extension of credit to a "borrower".

With respect to this "endorsement", we shall not be liable to make any payment under this policy in connection with any claim made against any "insured" for:

A. Extension of credit to any director, officer or employee of the "company", or to any entity in which such persons own more than 25 percent of any class of voting securities; or

B. Extension of credit which was, or which would have been at the time of its making, in excess of the legal lending limit of the "company" or any related entity which extended the credit; or

C. Lending or financial advisory service where such services are provided for a fee and are not part of the normal process of extending credit to the "borrower"; or

D. Arising out of any actual or alleged violation of federal, state or local laws or regulations relating to extensions or denials of credit, including but not limited to: Truth-in-Lending, Equal Credit Opportunity or usury laws or regulations.

The definitions set forth below shall apply to this "endorsement" only and shall not apply to the policy to which this "endorsement" is attached.

A. "Wrongful Lending Act" shall mean any negligent act or omission, error, misstatement, misleading statement, or neglect or breach of duty by the Company.

B. "Borrower" shall mean any person or entity which is not directly or indirectly affiliated with the Company in any respect and to which an extension or credit or refusal to extend credit was made or negotiated.

The Limit of Insurance applicable to this coverage shall be $ **10,000,000.** per Policy Period and the Deductible shall be **$75,000.** per "loss". All payments of "loss" under this Endorsement shall reduce the Limit of Insurance indicated in Item 4. of Part 1 of the Declarations.

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____     The Cincinnati Insurance Company

By _____
        (Authorized Representative)

F 3132 06 83 C                                                        Page 2 of 2

# THE CINCINNATI INSURANCE COMPANY

## ENDORSEMENT
### No. _____

| Attached to and Forming Part of Policy No. BCP - 8737276 | Issued to: Integrity Bancshares, Inc. | Effective date of Endorsement: 08-28-2006 |
|---|---|---|

## MODIFIED DEFINITION OF PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**FINANCIAL INSTITUTIONS BLUE CHIP POLICY (PART I – DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE)**

The definition of "professional services" under **SECTION IV – DEFINITIONS** is deleted and replaced by the following:

**G.** "Professional services" means the activities allowed under the law and regulations governing financial institutions which are performed for or on behalf of any client or customer of the "company", but shall not include any "trust services" as defined under Coverage Part **IV**.

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____     The Cincinnati Insurance Company

By _____
          (Authorized Representative)

F 3132 06 83 E

# THE CINCINNATI INSURANCE COMPANY

## ENDORSEMENT
No. _____

| Attached to and Forming Part of Policy No. BCP - 8737276 | Issued to: Integrity Bancshares, Inc. | Effective date of Endorsement: 08-28-2006 |
|---|---|---|

## SUBSIDIARY COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BLUE CHIP POLICY
FINANCIAL INSTITUTIONS BLUE CHIP POLICY
HEALTH CARE INSTITUTIONS BLUE CHIP POLICY
PUBLICLY TRADED COMPANY BLUE CHIP POLICY**

It is hereby understood and agreed that all "Subsidiaries" of the "Insured Entity" shall be included in coverages provided by Part II, Employment Practices Liability Coverage.

All other provisions of the policy remain unchanged except as herein expressly modified.

Date Issued: _____     The Cincinnati Insurance Company

By _____
(Authorized Representative)

F 3132 06 83 P

SIDNEY O SMITH INC
P O BOX 1357
GAINESVILLE GA   30503-1357

10108

Policy Number:    BCP 873 72 76
Effective Date:    08-28-2006
                  Integrity Bancshares, Inc.
Named Insured:

15% Commission

RECEIVED SEP 18 2006

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRITY BANCSHARES, INC. | ) | Case No. 08-80512 |
| | ) | |
| | ) | |
| Debtor. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that this 5th day of November, 2008, I served a true and correct copy of the NOTICE OF HEARING AND MOTION OF CERTAIN FORMER DIRECTORS AND OFFICERS OF INTEGRITY BANCSHARES, INC. FOR APPROVAL OF DEFENSE FUNDING UNDER DIRECTORS' AND OFFICERS' INSURANCE POLICY AND FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d) TO EFFECTUATE THE SAME, by U.S. First Class Mail, postage prepaid, to:

| | |
|---|---|
| **Integrity Bancshares, Inc.**<br>11138 State Bridge Road<br>Alpharetta, GA 30022 | **Wendy L. Hagenau**<br>Powell Goldstein LLP<br>One Atlantic Center - 14th Floor<br>1201 W. Peachtree Street, NW<br>Atlanta, GA 30309-3488 |
| **Jordan E. Lubin**<br>Trustee<br>Building 2 8325 Dunwoody Place<br>Atlanta, GA 30350 | **U.S. Trustee**<br>Office of the US Trustee<br>Suite 362<br>75 Spring Street, SW<br>Atlanta, GA 30303 |
| **Gina Micalizio**<br>Federal Deposit Insurance Corp.<br>As Receiver for Integrity Bank<br>11140 State Bridge Road<br>Alpharetta, GA 30022 | |

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
WENDY R. REISS
Georgia Bar No. 600295
wendy.reiss@alston.com
1201 West Peachtree Street
Atlanta, Georgia 30309-3424